ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| YORK WALLCOVERINGS, INC., | : | |
| Plaintiff, | : | NO. 1:CV-01-0793 |
| v. | : | (The Hon. Sylvia H. Rambo) |
| S.A. MAXWELL COMPANY, INC. and JAIMA BROWN, | : | |
| | : | |
| Defendants. | : | |

FILED
HARRISBURG, PA

APR 0 1 2002

MARY E. D'ANDREA, C
Per _____

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Defendants S.A. Maxwell Company, Inc. (hereinafter "Maxwell") and Jaima Brown (hereinafter "Brown") (collectively referred to as "Defendants") submit this memorandum of law in opposition to the Motion for a Preliminary Injunction filed by Plaintiff, York Wallcoverings, Inc. (hereinafter "York" or "Plaintiff").

On March 14, 2002, over 13 months after the copyright infringement complained of in this action first came to York's attention, ten months after the instant civil action was commenced, while the case is in the last weeks of fact discovery, and some six months before the scheduled trial date, Plaintiff has served a Motion for a Preliminary Injunction. Defendants submit that the motion should be denied for at least three reasons: (1) the lack of success on the merits, as confirmed by Defendants' showing of independent creation; (2) the absence of irreparable harm as confirmed by the untimeliness of the motion; and (3) the balancing of the equities.

### FACTS

The facts relevant to this Motion are set forth in the affidavits of Richard L. Emmert,

1

Maxwell's President, Jaima Brown, Maxwell's Director of Design, and Albert Robin, Defendants'

attorney, making of record admissions made by York during discovery and the chronology of this

case, which are attached hereto as Exhibits A, B, and C . As is set forth in the Robin affidavit, ¶¶7-

8, William Carroll, the independent designer who created the allegedly infringing designs, will

testify at the hearing and a declaration from him will be submitted as soon as it is available.

ARGUMENT

On this motion, the Court must consider four factors: (1) whether Plaintiff has shown a

strong or substantial likelihood or probability of success on the merits; (2) whether Plaintiff will

suffer immediate irreparable harm if the conduct complained of is not enjoined pending the final

hearing; (3) the harm to Defendants if a preliminary injunction is entered; and (4) whether the

public interest is served by issuance of a preliminary injunction. *Allegheny Energy, Inc. v. DQE,*

*Inc.*, 171 F.3d 153, 158 (3d Cir. 1999); *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187,

191-92 (3rd Cir. 1990).

"Preliminary injunctions are an extraordinary remedy, and are discretionary with the trial

judge." *Orson, Inc. v. Miramax Film Corp.*, 836 F. Supp. 309, 311 (E.D. Pa. 1993).  If either

likelihood of success on the merits or a probability of immediate irreparable injury is not

established, a preliminary injunction should not issue. *See Binney & Smith v. Rose Art Industries*,

2000 U.S. Dist. LEXIS 18384, Civ. A. No. 00-2939 (E.D. Pa. Dec. 21, 2000).  Perhaps the single

most important prerequisite for the issuance of a preliminary injunction is a demonstration that if

it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits

can be rendered.  11A WRIGHT, MILLER & KANE, FED. PRAC. & PROC.: CIVIL 2D § 2948.1.

Defendants submit that application of these factors to the record on this motion does not

support issuance of a preliminary injunction.  Since there is no evidence that anyone involved in

the creation of Defendants' "elephant, palm and scroll" sidewall and border designs ("Maxwell Designs") copied Plaintiff's "elephant" sidewall or border designs ("York Designs")[1] and there is substantial evidence that the Maxwell Designs were independently created, Plaintiff will not be able to establish its claim of copyright infringement. Furthermore, Plaintiff's delay in moving for a preliminary injunction clearly evidences the lack of any irreparable harm to Plaintiff. Finally, a balancing of the nonexistent risk of irreparable harm to Plaintiff against the significant damage and undue prejudice Defendants are likely to suffer from issuance of a preliminary injunction also requires the denial of such extraordinary relief.

## I. PLAINTIFF IS NOT LIKELY TO SUCCEED ON ITS CLAIM OF COPYRIGHT INFRINGEMENT

In order to establish that the Maxwell Designs infringe the York Designs, Plaintiff has the burden of proving (1) ownership of a valid copyright, and (2) copying by Defendants of constituent elements of the work that are original. *Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.*, 797 F.2d 1222, 1231 (3rd Cir. 1986), *cert. denied*, 479 U.S. 1031, 93 L. Ed. 2d 831, 107 S. Ct. 877 (1987). Regardless of Plaintiff's success in proving copying, independent creation is a complete defense to the claim of copyright infringement. *Id.* at 1227, n.7.

If Plaintiff is relying upon the purported copyright registrations attached to the Complaint and as Exhibit A to its Application for an Order to Show Cause, it should be noted that (a) these are only copyright applications and not registrations, (b) the language is not the same as in the registrations that purportedly issued and (c) an attempt has been made to correct some erroneous

---

[1] While there are two copyrights and two designs involved and while different issues attach to each, as a practical matter, one cannot be sold without the other so there is no need to distinguish between them for the purposes of the instant motion.

information in one of those registrations.[2]

Section 408(d) of the Copyright Act, 17 U.S.C. § 408(d), provides that the information contained in a supplementary registration augments but does not supersede that contained in the earlier registration. Thus, Plaintiff's certificates of Supplementary Registration do not have the effect of expunging or canceling its previous copyright registrations. Since Plaintiff's supplementation of its erroneous registration statement results in the two recorded contrary facts (1) that Banafshe Schippel, from whom it has no assignment, is the author of the York sidewall design at issue and (2) that Patricia Scullen, form whom it has an assignment, is the author, there is no prima facie presumption. *Masquerade Novelty v. Unique Indus.*, 912 F.2d 663, 668 n.5 (3d Cir. 1990) (stating that "the correct approach in situations where there has been a material, but inadvertent omission, is to deprive the plaintiff of the benefits of § 410(c) [prima facie presumption of validity that registration conveys] and to require him to establish the copyrightability of the articles he claims are being infringed"); *see also NBC Subsidiary, Inc. v. Broadcast Information Services, Inc.*, 717 F. Supp. 1449, 1451 (D. Colo. 1988) (stating that "the prima facie effect of the registration … will be neutralized because it will contain conflicting statements of facts").

Due to Plaintiff's misstatement as to authorship in its original copyright application, Plaintiff has the burden to establish that its copyright in the York Designs is valid. Plaintiff has not submitted any testimony or evidence, other than its original and supplementary copyright applications, to support its claims of copyright in the York Designs. Furthermore, Plaintiff's

---

[2] On January 31, 2002, Plaintiff filed to supplement its copyright registration entitled "Elephant Sidewall" to indicate that "Patricia Sculling" was the correct author rather than "Banafshe Schippel," the author it had listed in its original application. Since the "Elephant Border" is a distinctive work, the validity of York's copyright depends on the validity of its "Elephant Sidewall" registration.

Complaint still alleges that Banafshe Schippel is the author. Thus, Plaintiff has not met its burden of proof regarding the validity of its copyright claims.

Even if Plaintiff could establish ownership of a valid copyright, there can be no copyright infringement unless Defendants copied. While copying may be presumed upon proof of access and substantial similarity, such a presumption can be rebutted by proof of independent creation. Here, there is no evidence that anyone involved in the creation of the Maxwell Designs copied the York Designs. While Defendants have admitted having access to the York Designs, Plaintiff has failed to submit any evidence to overcome Defendants' evidence that the Maxwell Designs were independently created.

The principal issue in this case is whether William Carroll (hereinafter "Carroll"), the freelance designer who created the Maxwell Designs, independently created them or copied them from the York Designs. Carroll will testify at the Preliminary Injunction hearing. Carroll not only furnished Maxwell with Design Assignments representing and warranting his independent creation, but he has told representatives of both Plaintiff and Defendants that he did not copy the York Designs. Also, Stan Thomas, York's Assistant Secretary and Assistant Treasurer, has testified that he "believed that he [Carroll] did not copy the York design." Albert Robin Affidavit Exhibit 3.

As explained in greater detail in the affidavit of Jaima Brown, the Maxwell Designs were created by Carroll on the basis of a Design Brief that she furnished. The original design brief, Jaima Brown Affidavit Exhibit 2, referred to four animals, including the elephant, and was accompanied by a group of references. The references included two pieces of fabric depicting elephants, a number of pages from magazines and other printed materials depicting elephants and palm trees and other elements and a very rough pencil sketch. The references

also included a piece of a sidewall containing the York Design[3], the purpose of its inclusion was merely to illustrate a "textural" paper.[4]  Furthermore, the three colorways of the Maxwell Designs were chosen by Brown based on her knowledge of marketplace trends and without reference to any colorways used by York.  In fact, York's complaint and its discovery requests are limited to only two of the three Maxwell colorways.

Because the Maxwell Designs were created independently, it is unnecessary to reach the issue of substantial similarity.  Of course, the parties' designs are not substantially similar for purposes of establishing infringement when viewed under the applicable standard.  To show "substantial similarity," Plaintiff must satisfy both the "extrinsic test," *i.e.*, whether sufficient similarity exists between the two works to conclude that the Defendants used the copyrighted work in creating the allegedly infringing work; as well as the "intrinsic test," *i.e.*, whether, from a lay perspective, the alleged copying constitutes an unlawful appropriation of the copyrighted work.  *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir.), *cert. denied*, 502 U.S. 939 (1991).  Here, Plaintiff has not satisfied either.

With regards to the extrinsic test, Plaintiff has not submitted any expert testimony to establish striking similarity.  *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir.), *cert. denied*, 502 U.S. 939 (1991) ("In making this determination, expert testimony and a visual comparison between the copyrighted work and the allegedly infringing work are frequently utilized").  As for the intrinsic test, Plaintiff has not shown that the parties' designs are "so strikingly similar as to preclude the possibility of independent creation." *M.S.R. Imports,*

---

[3] Of course, as Elizabeth Lydon, York's Design Director had conceded, it is perfectly proper to use a competitor's wallcovering as a reference.  Robin Affidavit, Exhibit 4.
[4] Plaintiff's Memorandum erroneously states Brown told Carroll that "she liked the texture and *feel* of the York Elephant Wallcovering [emphasis added]."  Brown referred only to "textural," and not to the "texture" or the "feel," of the York Design (pp. 5, 8).

6

*Inc. v. R.E. Greenspan Company, Inc.*, 220 U.S.P.Q. 361, 371 (E.D. Pa. 1983); *Testa*, 492 F. Supp. at 203.

Indeed, Plaintiff has clearly failed to show that any similarities between the York Designs and the Maxwell Designs "are of a kind that can only be explained by copying, rather than by coincidence, independent creation, or prior common source." *Association of American Medical Colleges v. Mikaelian*, 571 F. Supp. 144, 151 (E.D. Pa. 1983), *aff'd*, 734 F.2d 3 (3d Cir. 1984). Here, not only does the creator of the Maxwell Designs claim independent creation, but also, a simple comparison of the parties' designs does not refute his claim. *See* 3 M. NIMMER, COPYRIGHT § 13.02[B] n.20 ("striking similarity simply means that in human experience it is virtually impossible that the two works could have been independently created").

Furthermore, in determining substantial similarity, it is only an author's copyrightable expression that is entitled to protection and not merely ideas portrayed in the copyrighted work. *See, e.g., Universal Athletic Sales Co. v. Pinchock*, 423 U.S. 863, 908, 46 L. Ed. 2d 92, 96 S. Ct. 122 (1975) ("a copyright is not infringed by an expression of the idea which is substantially similar where such similarity is necessary because the idea or system being described is the same"); *Mazer v. Stein*, 347 U.S. 201, 207, 98 L. Ed. 630, 74 S. Ct. 460 (1954) (copyrights protect only expressions of ideas and not ideas themselves); *Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.*, 797 F.2d 1222, 1231 (3rd Cir. 1986), *cert. denied*, 479 U.S. 1031, 93 L. Ed. 2d 831, 107 S. Ct. 877 (1987) (stating that "[i]t is axiomatic that copyright does not protect ideas, but only expressions of ideas").

Here, the designs at issue share the idea of Indian elephants. Defendants' designer, utilized an "elephant" fabric supplied to him by Jaima Brown and references to Indian tapestry that he already had in his possession, copies of which are attached to the Robin affidavit as

Robin Exhibits 5, 6, 7 and 8.

Thus, Plaintiff's claim of substantial similarity is belied by the common source of the designs in Indian tapestry.

Furthermore, It seems clear from a side-by-side comparison of the parties' designs that there are numerous differences discernable to any observer in addition to differences in size and price, as set out in the Emmert affidavit.  The use by the Wallpaper Guide of very different language to describe the two designs, quoted in paragraphs 21-22 of the Jaima Brown Affidavit, is evidence that the trade also views them as different.  The Maxwell Designs features a palm tree and a scroll, in addition to an elephant, features neither found nor suggested in the York Designs. While the York Designs have two different elephant drawings, one with an upturned trunk and one with a downturned trunk, the Maxwell Designs only feature one type of elephant drawing.  Other features of the respective elephant drawings incorporated in the parties' designs are clearly different, such as the positioning and design of the cloaks, the length of the tusks and the angle of legs.  Thus, it seems clear that the parties' designs are not substantially, much less strikingly, similar.

Plaintiff also attempts to establish substantial similarity on the basis of the colors in the two designs, which are said to be essential design features.  The Regulations of the Copyright Office provide that variations of coloring are not subject to copyright protection.  37 CFR §202.1; *see also Boisson v. Banian, Ltd.*, 273 F.3d 262, 271 (2d Cir. 2001) ("a particular color is not copyrightable" and only "the author's choice in incorporating color *with other elements* may be copyrighted" [emphasis added]).  Even if color were subject to copyright, Plaintiff never claimed copyright protection in the coloring of its wallcovering or border designs, let alone in each of the three colorways in which its design appears.  Plaintiff's copyright registrations do not

even refer to any particular color scheme, and Defendants have been unable to ascertain which, if any, of the colorways were deposited in the Copyright Office.

Of course, not only is there no evidence here that Defendants copied the colors in the York Designs. But, even if there were such evidence, since Plaintiff has never sought nor obtained copyright protection in the color schemes used in its design, such copying of color would not establish copyright infringement. As the court stated in *York Wallcoverings, Inc. v. Coloroll, Inc.*, 681 F. Supp. 1004, 1008 (E.D.N.Y. 1987), in denying a motion for preliminary injunction to the same plaintiff:

> [T]his court finds that copyright protection does not extend to York's colorways because York's copyright of Adele did not include the colorways.
> *      *      *
> Although reference to the copying of the colorways by Coloroll is some proof of copying, it is not sufficient to prove copying of the design.

Here, too, the similarity in the parties' designs is derived from their common depiction of elephants in an Indian motif. Since Plaintiff did not obtain copyright protection in its colors, then any similarity between the parties' color choices cannot be considered on the issue of substantial similarity. Furthermore, while comparison of color schemes may be used to show copying, it cannot be used as evidence of substantial similarity.

## II.  PLAINTIFF HAS NOT MADE A SHOWING OF IRREPARABLE HARM ENTITLING IT TO PRELIMINARY INJUNCTIVE RELIEF

Plaintiff appears to base its claim of irreparable harm on a presumption arising from a showing of copyright infringement. While Plaintiff has failed to demonstrate a likelihood of success on the merits of its claim of copyright infringement, even if it had, the presumption of irreparable harm would still be rebutable. The case that Plaintiff attaches to its memorandum, *Price v. Metzner*, makes it clear that it is only a presumption, and the Third Circuit case cited therein, *Kontes Glass Company v. Lab Glass, Inc.*, 373 F2d 319, 320, 321 (3d Cir. 1967)

9

evidence that irreparable harm has not and will not occur.  *See, e.g., New Dana Perfumes Corp. v. Disney Store, Inc.*, 131 F. Supp. 2d 616 (M.D. Pa. 2001) (holding that plaintiff's unexplained delay of two months in presenting a cease and desist letter, and another unexplained delay of five months in moving for injunctive relief precluded a finding of irreparable harm, and therefore warranted denial of its preliminary injunction motion); *Country Floors, Inc. v. Gepner*, 1989 U.S. Dist. LEXIS 7063 (E.D. Pa. 1989) (denying injunctive relief, partly due to plaintiff's delay in seeking injunctive relief which had undercut any presumption that infringement alone had caused irreparable harm *pendente lite*); *American Int'l Group, Inc. v. American Int'l Airways, Inc.*, 726 F. Supp. 1470 (E.D. Pa. 1989) (denying to issue an injunction, ruling that the presumption of irreparable harm was undermined because plaintiff delayed in seeking relief); *Richard Feiner & Co. v. Turner Entertainment Co.*, 98 F.3d 33 (2d Cir. 1996) (holding that plaintiff's delay of over a year in seeking relief made an injunction improper since such delay was suggestive of a lack of irreparable harm).  Furthermore, Plaintiff has not proffered any, much less a persuasive, explanation for its delay in seeking injunctive relief.

Irreparable harm is the type of harm that cannot be quantified.  *See Luckenbach S.S. Co. v. Norton*, 21 F. Supp. 707 (E.D. Pa. 1937) (harm is irreparable when it cannot be adequately compensated in damages because of the nature of the injury itself, or the right or property that is injured, or because there exists no certain pecuniary standard for measurement of damages).  Here, Plaintiff did not mention any form of irreparable harm in its initial disclosure of damages.[5]  *See* Fed. R. Civ. P. 26(a)(1)(C) (mandating disclosure of "a computation of *any category* of damages claimed by the disclosing party" [emphasis added]).  Not only has Plaintiff's failure to

---

[5] By letter dated January 2, 2002, Plaintiff's counsel furnished a document entitled "Damages Calculation."  The document made no mention of any "irreparable" damages being suffered by Plaintiff and no documents were then or have subsequently been

include in such disclosure any reference to irreparable harm is further evidence that Plaintiff has not suffered any irreparable harm. Furthermore, pursuant to Rule 37, "[a] party that without substantial justification fails to disclose information required by Rule 26(a) … is not … permitted to use as evidence at a trial, at a hearing, or on a motion any … information not so disclosed." Fed. R. Civ. P. 37(c)(1). Thus, Plaintiff should be barred from asserting any non-monetary damages that may be subject to extra-ordinary equitable relief such as its request for a preliminary injunction at issue here.

With respect to Plaintiff's claim of loss of reputation, Plaintiff has made no specific showing as to how Defendants' continued sale of the Maxwell Designs between February 2001 and the present has injured, let alone how the continued sale until the time of trial could injure, Plaintiff's reputation.[6] In the absence of any evidence to support this claim of lost reputation, it is nothing more than speculation. Plaintiff's reliance on *Price v. Metzner*, 574 F. Supp. 281 (E.D. Pa. 1983), in this regard is misplaced. In *Price*, the court presumed the likelihood of irreparable harm based on its finding that plaintiff was likely to succeed on the merits due to the existence of direct proof of copying which precluded the possibility of independent creation. The *Price* court focused on harm due to direct competition and selling price disparity only *after* it had concluded that the plaintiff's copyright was infringed. Here, there is no direct proof of copying and, as stated by Carroll, the author of the Maxwell Designs, they were independently created.

Furthermore, the Third Circuit has repeatedly held that loss of sales and loss of business reputation, like the other harms Plaintiff alleges, are all harms that can be remedied legally. *See, e.g., Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir.

---

produced relating to "irreparable" harm.
[6] Though briefly mentioned in Plaintiff's memorandum, p. 10, confusion as to the source or origin of the parties' designs is the barometer of trademark infringement and is not

1989) (holding that "money damages will fully compensate [plaintiff] for its losses" even though the plaintiff had alleged that its "business would be completely destroyed, its employees and jobs would be lost and its goodwill and business reputation would be ruined" without injunctive relief); *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) (loss of sales and customers compensable by money damages).

Plaintiff has not produced any evidence that its alleged damages cannot be remedied at law. In fact, Plaintiff's President has admitted that it can. Robin Affidavit ¶4. Any perceived difficulty Plaintiff envisions in proving damages is not enough to entitle it to extraordinary injunctive relief. This is particularly so given the modest sales to date of the Maxwell Designs. Thus, even if Plaintiff were ultimately able to prove infringement, any harm to Plaintiff at this time would not rise to the level of irreparable harm necessary to obtain a preliminary injunction. In the unlikely event that Plaintiff were to prevail at trial, Maxwell could certainly respond to any damage claim relating to sales of the Maxwell Designs.

### III. THE ISSUANCE OF A PRELIMINARY INJUNCTION WOULD UNDULY PREJUDICE THE DEFENDANTS

The timing of Plaintiff's motion does not appear to be coincidental. As Mr. Brown states in his affidavit in support of Plaintiff's Order to Show Cause, the typical lifespan of a wallcovering sample book is three years, with most sales generated during the first 12 months. The York Designs were first sold in October of 1999, and the three years for Plaintiff will be up in October of this year. On the other hand, the Maxwell Designs were first sold in February of 2001, and the three years for Defendants will not be up until February of 2004. Thus, a preliminary injunction will be of minimum benefit to Plaintiff and serve only to punish Defendants.

---

relevant in a copyright infringement analysis.

The punishment to Defendants will necessarily extend far beyond the discontinuance of sale of the Maxwell Designs of which Plaintiff complains. The Sesquicentennial Collection consists of 88 sidewalls and 21 borders, in addition to those in suit. As is set forth in the accompanying affidavit of Richard L. Emmert, the practical effect of a preliminary injunction against the two sidewalls and the two borders in suit will be to enjoin sale of all 90 sidewalls and all 23 borders included in the Sesquicentennial Collection.

If Maxwell were enjoined from the continued sale of the sidewall and border in suit and required to seek removal of samples of those designs from the approximately 6,600 books in the hands of distributors and retailers, there seems no question that these distributors and retailers would dispose of the entire books rather than attempt to remove the samples at issue. Emmert Affidavit ¶ 14.

Even if a preliminary injunction did not require the removal of the allegedly infringing samples from the books but only the discontinuance of their sale, most of the retailers would cease display of the these books rather than have to explain to customers which of the samples in the books are no longer available. Whatever the scope of the preliminary injunction, Maxwell's present inventory of all sidewalls, borders and fabrics in its Sesquicentennial Collection, most of which is not unrelated to York's copyright infringement claims, and Maxwell's anticipated profits thereon, will be lost. Emmert Affidavit ¶ 15. Moreover, since each of the sample books cost these retailers up to $60, they would undoubtedly look to Maxwell for at least partial reimbursement of that cost. Emmert Affidavit ¶ 17.

Thus, the injury to Maxwell's business caused by the issuance of a preliminary injunction will be substantial and far disproportionate to any injury that York could sustain by the continued sale of the Maxwell Designs through the time of trial.

14

## IV.   THE PUBLIC INTEREST WOULD NOT BE SERVED BY ENJOINING THE DEFENDANTS

Plaintiff has also failed to shown how the public interest will be served by issuing a preliminary injunction against the Maxwell Designs. While the public has an interest in protecting copyrighted works against infringement, the record on this motion does not establish a claim of copyright infringement. Thus, Plaintiff has not demonstrated its entitlement to interrupt the free and competitive flow of goods in the marketplace. The public should remain free to purchase all non-infringing wallcoverings, including the Maxwell Designs.

## CONCLUSION

In view of the foregoing, it is respectfully submitted that Plaintiff's Motion for a Preliminary Injunction be denied in all respects.

Dated:  March 29, 2002

Albert Robin
Attorney for Defendants
330 Madison Avenue
New York, New York 10017
(212) 682-9640

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

YORK WALLCOVERINGS, INC.,      :

         Plaintiff,      :    NO. 1:CV-01-0793

           v.        :    (The Hon. Sylvia H. Rambo)

S.A. MAXWELL COMPANY, INC.   :
and JAIMA BROWN,          :

         Defendants   :

## AFFIDAVIT OF RICHARD L. EMMERT IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

STATE OF ILLINOIS)
          : ss.:
COUNTY OF LAKE  )

Richard L. Emmert, being duly sworn, deposes and says:

1.     I am the President of S.A. Maxwell Company, Inc. ("Maxwell"), one of the Defendants herein.  I am fully familiar with all of the matters hereinafter set forth.

2.     I make this affidavit in opposition to a Motion filed by Plaintiff, York Wallcoverings, Inc. ("York") for a Preliminary Injunction.

3.     Maxwell has been in the wallcoverings business since 1851 as a retailer, distributor and, for over 50 years, as a manufacturer/converter of its own lines of wallcoverings.

4.     In this litigation, York complains that two of the colorways of the Maxwell "elephant, palm and scroll" sidewall infringe a York copyright covering its

"Exhibit A"

"elephant" sidewall and that two of the colorways of the Maxwell "elephant, palm and scroll" border infringe York's copyright in its "elephant" border.

5.    While York contends in its motion that three colorways of the Maxwell "elephant, palm and scroll" sidewall and border are involved as well as a Maxwell "elephant, palm and scroll" fabric, it is clear from the complaint (¶¶ 20, 21, 24 and 25), which has never been amended, and from definitions Nos. (3) and (4) used in Plaintiff's Interrogatories and Plaintiff's Request for Production, copies of which are attached to the affidavit of Albert Robin, that the third colorway and the fabric are not involved.

6.    The Maxwell "elephant, palm and scroll" sidewall and border are part of Maxwell's Sesquicentennial Collection and are sold through the Maxwell Sesquicentennial Sample Book which was first distributed in January-February, 2001.

7.    The Maxwell Sesquicentennial Collection was intended to commemorate Maxwell's 150th anniversary.

8.    The Maxwell "elephant, palm and scroll" sidewall and border were created by an independent designer, William Carroll, who was retained by Jaima Brown, Maxwell's Design Director, to design an "Animal Faux Botanical Group" sidewall and border.

9.    To the best of my knowledge, in its 150-year history, Maxwell has never before been accused, let alone sued, for copyright infringement.  Since I have been associated with Maxwell, Maxwell has never copied nor asked anyone to copy a wallcovering design owned by another.  I know that Mr. Carroll was not asked by Maxwell to copy a York design, and I am satisfied that Mr. Carroll was not asked by Ms. Brown to copy any York design and that he did not do so.

10.     Mr. Carroll assigned the designs he created to Maxwell by documents including warranties of ownership and independent creation.

11.     After the commencement of this litigation, Mr. Carroll confirmed these warranties, including his independent creation, to an attorney representing Maxwell.

12.     I am informed that both prior and subsequent to his creation of the "elephant, palm and scroll" designs for Maxwell, Mr. Carroll has created and continues to create wallcovering designs for York.  I am also informed that Mr. Carroll has stated to York that he did not copy any York design, and that one officer of York has testified that he believes this statement of Mr. Carroll.

13.     While the "elephant, palm and scroll" sidewall and border designs are included in the Maxwell Sesquicentennial Sample Book, there are 88 other sidewalls and 21 other borders offered for sale and sold through the same book.

14.     If Maxwell were enjoined from the continued sale of the sidewall and border in suit and required to seek removal of samples of those designs from the approximately 6,600 books in the hands of distributors and retailers, there seems no question that the retailers would dispose of the entire books rather than attempt to remove the samples at issue.

15.     Even if a preliminary injunction did not require the removal of the allegedly infringing samples from the books but only the discontinuance of their sale, I have no doubt that most of the retailers would cease display of these books rather than have to explain to customers which of the samples in the books are no longer available.

16.     This will have the probable result of eliminating not only the possibility of future sales of the sidewalls and borders at issue but also of the numerous other sidewalls, borders and fabrics in the Sesquicentennial Collection.

17.     Moreover, since each of the sample books costs these retailers up to $60, they would undoubtedly look to Maxwell for at least partial reimbursement of that cost.

18.     While our estimate is that future sales of the allegedly infringing sidewalls and borders will not exceed $50,000, our estimate is that future sales of the entire Sesquicentennial Collection, not including the allegedly infringing designs, will approximate $750,000.

19.     If a preliminary injunction were to issue, Maxwell would not only sustain the loss of sales of designs referred to in paragraphs 15 and 18, above, as to which York has no claim, but Maxwell's reputation would suffer as well.  If Maxwell were thereafter to prevail at trial, it would be impossible to make up the lost sales of the Sesquicentennial Collection or to undue the injury done to its reputation.

20.     While Maxwell will be substantially harmed both monetarily and reputation wise by the entry of a preliminary injunction, I do not believe that York will suffer any harm, let alone irreparable harm, if a preliminary injunction is not issued.  By the time of the hearing on the Motion for a Preliminary Injunction, the York patterns will have been on the market for over 30 months, and, as York admits, they would have enjoyed half of their expected sales in the first 12 months.  Moreover, not only are the designs of the York and Maxwell wallcoverings in suit different, but they are printed by different processes and on different types of paper and in different dimensions and sold at different prices.

21.    The York borders are 6¾ inches high with a design repeat every 25 ¼ inches, while the Maxwell borders are 8 inches high with a design repeat every 20 ½ inches.  The York sidewalls are 27 inches wide with a design repeat every 25 ¼ inches, while the Maxwell sidewalls are 20 ½ inches wide with a design repeat every 20 ½ inches.

22.    A spool of the York border (5 yards) has a suggested retail price of $32.99, while a spool (5 yards) of the Maxwell border has a suggested retail price of $26.99.  A roll of the York sidewall (30 sq. ft.) has a suggested retail price of $35.99, while a roll of the Maxwell sidewall (28.1 sq. ft.) has a suggested retail price of $26.99. Thus, allowing for the slight difference in the square feet of the rolls, at the suggested retail prices, the cost of the York sidewall and border needed for a 9 by 12 feet room with 8 feet ceilings would approximate $675, while the cost of the Maxwell sidewall and border would be approximately $135 less.

23.    I am aware of no evidence even suggesting that anyone has mistakenly purchased the Maxwell wallcovering in suit in place of the York wallcovering in suit, and in view all of the differences between them described above, I do not believe such is likely to occur.  Insofar as a customer is looking for additional quantities of something previously purchased, these differences would make mistaken purchase impossible.

24.    Finally, if it were to turn out after a trial on the merits that Maxwell has infringed one or both of the copyrights in suit, then York could be entitled to recover Maxwell's profits from its infringing sales, and, if York can establish its lost sales from such infringement, which I do not believe to be the case, then York could be entitled to recover such lost profits to the extent they exceed Maxwell's profits.

WHEREFORE, it is respectfully requested that York's Motion for a Preliminary

Injunction be denied.

Richard L. Emmert

Sworn to before me this

27 day of March, 2002.

Notary Public

"OFFICIAL SEAL"
Ishaq Mohiuddin
Notary Public, State of Illinois
Lake County
My Commission Expires 7-19-05

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| YORK WALLCOVERINGS, INC., | : |
| | : |
| Plaintiff, | :    NO. 1:CV-01-0793 |
| | : |
| v. | :    (The Hon. Sylvia H. Rambo) |
| | : |
| S.A. MAXWELL COMPANY, INC. | : |
| and JAIMA BROWN, | : |
| | : |
| Defendants. | : |

AFFIDAVIT OF JAIMA BROWN IN OPPOSITION
TO MOTION FOR A PRELIMINARY INJUNCTION

STATE OF NEW YORK   )
                     : ss.:
COUNTY OF NEW YORK)

Jaima Brown, being duly sworn, deposes and says:

1.    I am one of the Defendants herein, and since April 6, 1999, I have been the Design

Director for S.A. Maxwell Company, Inc. ("Maxwell"), the other Defendant herein. I am fully

familiar with all of the matters hereinafter set forth.

2.    I make this affidavit in opposition to a Motion filed by Plaintiff, York Wallcoverings,

Inc. ("York") for a Preliminary Injunction.

3.    I obtained my Bachelors Degree in Fine Art and History from the University of

Guelph in 1981. Since my graduation, I have been employed in the wallcoverings industry, first as

colorist, designer/silk screen technician, assistant stylist, stylist, senior stylist and design director

of the Imperial Home Décor Group, a leader in design, manufacturing and marketing of quality

wallcoverings worldwide, which included the Sunworthy and Westmount brands.

1

"Exhibit B"

4.      Since I have been employed by Maxwell, my duties and responsibilities have been to develop new wallcovering collections, either styling the collection myself or overseeing the styling efforts of others.

5.      Over the years, I have developed a procedure for the development of new collections. First, I research the trends in design, not only of wallcoverings, but also of fabrics and clothing. I do this by attending trade shows, shopping and reading.

6.      Second, I keep abreast of trends in color, both by the activities referred to above and through attending meetings of the Color Marketing Association.

7.      I followed my usual practice in the development of the designs involved in this litigation, namely, Maxwell's Sesquicentennial Collection and the Maxwell "elephant, palm and scroll" sidewall and the Maxwell "elephant, palm and scroll" border included therein.

8.      The development of the Maxwell Sesquicentennial Collection began in early 2000, when I outlined the possible designs to be included in a "Traditionals Volume II," a copy of which is attached as Brown Exhibit 1. Two of the possible designs were an "Animal Botanical Border" and an "Animal Sidewall."

9.      I then refined the list of possible designs and prepared and sent design briefs to outside independent designers, since Maxwell then had no designers on staff.

10.     The design brief for the "animal faux botanical group," which became both the "elephant, palm and scroll" sidewall and the "elephant, palm and scroll" border, was sent on April 4, 2000 to William Carroll, and a copy of this design brief is attached as Brown Exhibit 2. It referred to four animals, namely the elephant, deer, zebra and tiger, and was accompanied by a group of "references," copies of which have been produced to Plaintiff and the originals of which will be brought to the hearing on the Motion for a Preliminary Injunction. The Design Brief was

2

also accompanied by a very rough pencil sketch on white paper no larger than 8 ½ by 11, which included one or more palm trees, a scroll and one or more elephants, and possibly a zebra.

11.  The "references" included pieces of fabric, some depicting elephants, and pages from magazines and other printed materials depicting palm trees and other elements.  These references also included a piece of the York elephant sidewall, the purpose of which was to illustrate a "textural" paper.  I did not intend that Mr. Carroll should copy or simulate the York design, and he has subsequently stated that the only references he used among those that I furnished were one of the pieces of fabric which included an elephant design and some of the printed materials that included palm trees.

12.  In paragraph 15 of York's application for an Order to Show Cause, Plaintiff's counsel states that I "specifically drew Mr. Carroll's attention to the copyrighted York Elephant Wallcovering and told Mr. Carroll that [I] liked the texture and feel of the York Elephant Wallcovering," claiming as support for this statement a portion of my deposition testimony attached thereto as Exhibit F.  Not only does my deposition testimony say no such thing, but as is set forth both in my testimony and in the Design Brief (Brown Exhibit 2), my only suggestion to Mr. Carroll with respect to this reference was that he "make textural similar to elephant samples" and "want it more like a textural paper like the elephant samples."   I did not tell Mr. Carroll that I liked the texture, let alone the feel of the York Elephant Wallcovering and my testimony is not susceptible to such interpretation.

13.  The principal reasons for inclusion of "elephants" were that "animals" and "Indian motifs" were then in fashion, and I had twice before designed elephant wallcovering, first in when I designed for Westmount prior to being employed by Maxwell, and then in 1999 for inclusion in the Maxwell Ivory Coast Collection, which was introduced in early 2000.  Although I knew before

Mr. Carroll created the Maxwell "elephant, palm and scroll" design that York had an elephant design in its Passport Collection, that was not a factor in my decision to include elephants in the Maxwell design.

14.    Within a couple of weeks after receipt of the design brief, Mr. Carroll submitted a pencil sketch, which I reviewed and commented upon. Mr. Carroll then made final drawings of both the sidewall design and border design that he sent to Maxwell on May 16, 2001. These final drawings were substantially identical to those finally used.

15.    I thereupon developed three colorways for the designs. In deciding upon the colorways, I followed my knowledge of color trends in the marketplace, which are summarized in the June 2000 issue of the Trend Curve, a copy of which is attached as Brown Exhibit 3.

16.    Because 2001 was the 150th anniversary of Maxwell's founding, and because the book in question was going to be the first book which Maxwell would introduce in 2001, we decided to name the book the Sesquicentennial Collection.

17.    We then sent most of the designs from the book to an independent cover designer, Pat Garmhausen, of Inhaus Designs, who produced three different cover designs. The one that we selected included an elephant holding a "Sesquicentennial" banner. Not only is the cover of the Maxwell Sesquicentennial book clearly distinguishable from the cover of the York Passport book, but the books are customarily displayed on shelves with only their spines showing, and the spines are completely different.

18.    At the time the cover design was selected, I had no conscious recollection, if I ever knew, that the York Passport book has an elephant design on its cover, and there was no mention of that fact by anyone involved in the selection process.

4

19.    Based upon my years of experience as a designer, I know that the elephant depicted in the Maxwell "elephant, palm and scroll" sidewall, border or Sesquicentennial book cover was not copied from the York elephant, and I do not believe that it is substantially similar thereto. Moreover, I do not believe that there is any substantial similarity between the designs of the York and Maxwell sidewalls or borders at issue, other than that they both contain elephants, albeit different elephants.

20.    I visit distributors and retailers on a regular basis. At no time has any distributor or retailer, or anyone else, ever commented to me about any alleged similarity, let alone substantial similarity, between the York and Maxwell designs.

21.    In fact, in one instance in which a member of the trade has described both the York and the Maxwell designs, the descriptions are very different. In the January 2001 issue of the Wallpaper Guide, and on the wallpaperguide.com web site, the York border is described as follows:

> A parade of ornately adorned Asian elephants marches across this 7 inch border. Sprays of leaves and flowers are tossed between the elephants: (Guide, p. CB42; web site under "elephants")

> An elephant draped in a gilded tapestry and wearing a hat and shoes walks across this East Indian influenced 6-3/4 inch border. The background features a large blossom and vertical stripes against a shantung pattern. (web site under "elephant")

22.    On the same web site under "elephants," the Maxwell design is described as follows:

> A pattern of palm trees and decorative elephants between the bands overlay a textural border resembling coarse linen.

23.    These descriptions, which were written by the Wallpaper Guide and not by either York or Maxwell, emphasize one of the significant differences between the two designs, namely the prominent use of palm trees in the Maxwell design.

24.    Both the complaint herein and Plaintiff's discovery requests limit York's claim of copyright infringement to only two of the three colorways used by Maxwell for its sidewall and border. Since all three of the Maxwell colorways use the identical design, and since the York copyrights do not cover color, this limitation appears to be a recognition that the Maxwell design does not infringe.

25.    The Maxwell elephant, palm and scroll sidewall and border designs are the product of extensive independent design efforts by Mr. Carroll and by me. In excess of $20,000 in costs were incurred by Maxwell for these efforts. Such an expenditure, which I believe is much larger than York's expenditure, is further evidence of independent creation.

WHEREFORE, it is respectfully requested that Plaintiff's Motion for a Preliminary Injunction be denied.

Jaima Brown

Sworn to before me this
26th day of March 2002.

Notary Public

ALBERT ROBIN
Notary Public, State of New York
No. 02RO3307240
Qualified in New York County
Commission Expires August 31, 2003

6

**TRADITIONAL'S VOLUME II**                              **MAXWELL BRAND**

- GRAPE BORDER
- GRAPE TRAIL
- DAMASK MEDALLION ALLOVER

- ANIMAL BOTANICAL BORDER
- ANIMAL SIDEWALL
- LINEN STRIPE
- BANANNA LEAF SIDEWALL
- BANNANA LEAF DIE CUT BORDER
- LEOPARD PRINT
- BAMBOO HARLEQUIN

- ROSE AND HYDRANGE DIE CUT BORDER
- ROSE AND HYDRANGE TRAIL
- SMALL ROSE BUD VINEY TRAIL

- LEAF BORDER
- LEAF TRAIL  WITH BIRDS
- ALLOVER LEAF
- LEAF STRIPE
- DRAGONFLIES TONE ON TONE
- ASIAN FAN BORDER OR BIRD CAGE BORDER?

**OR**

- LARGE URN SCROLL BORDER
- SMALL SCROLL  BORDER
- URN SIDEWALL
- SCROLL STRIPE
- MARBLE? MAYBE REPLACE WITH STRIPE OR PATTERN TO FALL ON TOP OF MARBLE

"Jaima Brown
Exh. 1 "

MY DESIGN LIST ORIGINAL

To: Bill Carroll
From: Jaima Brown
Date: April 4.2000
Subject; Design Brief for Animal Faux Botanical  Group

**Animal Faux Botanical Group**
- Design to repeat 20.5 x 20.5 inches
- Gravure. 7 colors:
1. Background Choke Beige; 3 tones
2. Red
3. Yellow
4. Green
5. Purple
6. Brown
7. black
- Yellow to fall under the green leaves to make yellow green
- background to be fading in and out, animal faux prints and bamboo: should include; leopard print, zebra print, bamboo print and a small leaf print. See drawing attached for sidewall coordinate design. Make fade in and out similar to the elephant samples.
- Botanical motifs in the sidewall include: pansy, red leaf botanical and red floral. There might be to much red so balance colors. Add in the little leaf and flowers where needed into the design.
- Animal motifs try: elephant, deer, zebra and tiger. This might be to many so try perhaps without the zebra.
- Make animals bigger than in the fabric. Try 20%   larger. I don't want them as big as the elephant samples. Just a nice balance to this fabric.
- Make textural similar to elephant samples.
- This design to co-ordinate but not to be exact design as fabric. Want it more like a textural paper like the elephant sample. Have some of the beige from the choke come through into the motifs.
-

"Jaima Brown
Exh. 2 "

Case 1:01-cv-00793-SHR    Document 30    Filed 04/04/2002    Page 29 of 59

Woods with finish names like walnut, mocha, mahogany and ebony are being embraced in both contemporary and casual settings because they look rich and unique. This is significant.

The move to warmer and more colorful wood tones will continue to the point where a year from now it will be unusual to see more than a few blond introductions. Medium hues will have the majority of the business as we await the next shift—but what will that be?

Indications are that this shift may not move non-stop to deep Browns but will take a detour to cherry. Sales of traditional cherry (Brown cast, not Red, and minus the 1980's high sheen) have been more than encouraging; Pennsylvania House has seen sales nearly double since it redesigned a cherry group two or three markets ago. That's why they added 25 new pieces in April. Drexel Heritage introduced their version of cherry this Spring.

Is the market ready to return to honey oak and cherry? In an environment of choice, these two finishes, which were best sellers in the recent past, make perfect sense. Many consumers still love the look of honey oak and will appreciate how it warms up their blond room settings. And with a change in cast from Red to Brown, many will find cherry appealing again as well—particularly in pieces with a formal point of view that will dress up their casual vignettes. This is one to track for late 2001.

---

# TROPICAL

Tropical style, which began as nothing more than a suggestion during 1997 (see TTC™ Spring, 1997), has finally started to manifest itself in an array of products. Well-received collections from Lane (Jim Thompson) and Lexington (Tommy Bahama) were the most obvious contributors from the April High Point Furniture Market, yet many other companies are 'so participating with patterns and motifs that speak to the defining elements of the style.

For example, Bernhardt's Caneel Bay case



From the Tommy Bahama collection at Lexington

goods group, influenced by a tropical island feeling, is a mix of heavier raffia, laser cut glass, beaded detailing and diagonal wood grains in a refined resort feeling. Island Shores dinnerware from Nautica for Pfalzgraff takes tropical inspiration from the Pacific Rim to bring texture, tonal looks and solid color to the table. Companion Island Flower translates traditional native fabrics based on tropical foliage into dinnerware with a ground the color of sand and coconut colored flowers (sparingly placed). Accessories like trays with a bamboo design link Tropical to the Asian trend.

At Wesley Hall, there is a belief that Tropical is the natural heir to Asian; it fills the bill for all those who have found Asian too specific. The connection is through the foliage, extending the nature trend once again.

Having served its purpose, the bright color that was our first clue to this trend several seasons ago has vanished in favor of a more livable mid-tone palette. The fact that this palette

At Lane, a fabric with a wild cat sitting next to a palm tree is in the top three new fabric introductions from April.

© 2000 MARKETING DIRECTIONS, INC. ANY REPRODUCTION OF THIS PUBLICATION IS A DIRECT VIOLATION OF FEDERAL COPYRIGHT LAW. THIS INCLUDES, BUT IS NOT LIMITED TO, COLOR COPYING, ANY OTHER PHOTOCOPYING OR FAXING. E-MAIL DISTRIBUTION OF COPY OR POSTING CONTENT ON THE INTERNET.

"Jaima Brown – Exh. 3"

# TRENDCURVE



Nautica's Island Shores from Pfalzgraff

Although Silver is still selling well, there are fewer new introductions now. Bronze is moving to the mainstream as Copper continues to emerge. Makers report requests for Copper from the design trade.

- Pineapple...use as motif and form
- Orchids...emerging...expect volume
- Wild cats...especially cheetah, leopard
- Giraffe or leopard prints...accent only Mario Buatta's Green version looked fresh at John Widdicomb
- Elephant motifs
- Paisleys...one of several trends where they appear

Materials have an easy care, easy living feeling. Wicker and rattan are key. These natural materials appear in items for every room of the house, mostly in the medium colored finishes that bring a certain depth and character. The fact that the market has already demonstrated a high acceptance for this material only strengthens its ability to transfer a comfort level to the Tropical trend.

Meanwhile, woods may be lightly distressed or even reclaimed (Lane), so they are not perfectly formed. This irregular look speaks to a hand-made process that is in keeping with the mood of the product. The most notable of these woods is teak, which has been out of vogue since the Scandinavian trend lost popularity about 25 years ago.

Tropical will certainly be embraced because of its references to fantasy and escapism, but primarily because it offers an exotic approach to casual style. This is an important point of differentiation in a market where casual dominates and so must be expressed in enough ways to provide a real choice. Tropical style confirms that the casual look, while evolving, will remain.

Conspicuous by its absence in the Tropical style, however, are connections to the more evolved self; Tropical embraces the exotica of Asian style while taking a noticeable step away from mysticism, spirituality or a Zen attitude. This is a major shift that merits watchful consideration, not just as it relates to the Tropical trend, but also as it impacts the mood of home furnishings altogether.

includes accents of Persimmon and Saffron Orange adds a touch of zest to combinations that rely heavily on middle value Browns, Reds, Blues and Greens. These hues can be found in prints and in silk jacquards, as well as in other materials. Motifs reference the hot, humid climate that causes the pace of life to slow:

- Banana and palm fronds...both will be volume
- Palm trees...a key accent

© 2000 MARKETING DIRECTIONS, INC. ANY REPRODUCTION OF THIS PUBLICATION IS A DIRECT VIOLATION OF FEDERAL COPYRIGHT LAW. THIS INCLUDES, BUT IS NOT LIMITED TO, COLOR COPYING, ANY OTHER PHOTOCOPYING OR FAXING, E-MAIL DISTRIBUTION OF COPY OR POSTING CONTENT ON THE INTERNET.

# GEN-Y



Many companies are recognizing the potential of the Generation-Y customer, and it's coming not a moment too soon. Comprising those born since 1979, Gen-Y is 80 million strong and larger than the Baby Boom segment. Not only that, but Gen-Y has money to spend. Youth Intelligence estimates that 11-22 year olds alone have $200 billion in annual spending power today, a number that will increase over time. That's why Gen-Y merchandise is beginning to surface in a host of categories.

Targeted to "tweens," Lexington Furniture's Lauryn Oliva (in Country French styling and string-of-pearl accents) and Camp Hickory (with tree cut-outs and metal twig hardware) bedrooms were both successful introductions. These are groups that moms would buy. But there are many other products which are clearly targeted to Gen-Y shoppers themselves.

Extreme sports are a key point of reference for this market. At the Contemporary Furniture Fair, a TV stand made of bunge cords (designed by Edward Carpenter for RCA Design Products) looks like electronics hanging dangerously in mid-air. At the Domestics market, Tommy Hilfiger's bedding, done in Orange, Black, Gray and Urban Green, looks like a bed on the move due to the incorporation of mesh nylon, quilted nylon shams, side release buckles and blow uppillows. Pillowtex also jumped on the trend with their Provisions collection, which adds details like toggle or drawstring closures reflective tape and  sewn in labels for beds; towels look like rag socks.

Industrial references are also on the must-have list. Franklin Picture's Industrial Loft line includes rubber, floor tread and metal. Robert Sonneman's Glass House lamp from George Kovacs is made of aluminum glued to glass—no fasteners or screws, just a glue that reacts under UV light. Other references:

- Rubber logos
- Ripstop nylon
- Lacquered MDF with the look of metal

**Track and Field from Pillowtex**

It's not all about extreme and industrial, though. Town & Country reinforces a youthful feeling in vinyl shower curtains with inflatable accents such as sea horses or starfish. Ex-Cell's accent and floor pillows are done in retro shag, denim, vinyl and brightly colored skin prints while Revman's newest Dorm2Go introduction, Funkadelic, features a 1960's-look geometric done in fun, bright hues including Teal, Lime and Shocking Pink.

For the next couple of years, products targeted to personal spaces (bedrooms, bathrooms, computer nooks, play rooms, etc) rather than to general living areas have the greatest potential for Generation-Y. The companies with the best products will be those who speak directly to the target audience during the development process. Those who do so will find themselves riding a wave of success as the next generation of consumers comes rushing into the market.



**Youthful styling from Skypad: lacquered MDF with the look of metal**

© 2000 MARKETING DIRECTIONS, INC. ANY REPRODUCTION OF THIS PUBLICATION IS A DIRECT VIOLATION OF FEDERAL COPYRIGHT LAW. THIS INCLUDES, BUT IS NOT LIMITED TO, COLOR COPYING, ANY OTHER PHOTOCOPYING OR FAXING, E-MAIL DISTRIBUTION OF COPY OR POSTING CONTENT ON THE INTERNET.

# TRENDCURVE

Everything old is new again. In a trend that may become the equivalent of the textile world's ongoing business in documents and translations thereof and the furniture market's penchant for exact reproductions, tabletop companies are raiding their own well-stocked archives, often amassed over centuries, for inspiration. And why not? Archival product is a piece of history which today's consumer can own when the antique is unaffordable or unavailable.

# EVERYBODY'S MODERN

Retro references have been successful for several seasons. As they back away from happy faces, tie dye and the peace & love icons of the 1970's there is a rush toward a retro-futuristic point of view that is rooted in the 1950's but ventures as far as the 1970's. The approach is focused on Modern, organic forms and space-age designs, touching on Pucci-inspired patterns and high tech materials for a new look with a nostalgic tug.

The interest in authentic Modern pieces from the 1950's has escalated, causing makers like Herman Miller to reintroduce pieces like the

1952. Also reintroduced: George Nelson's Tray Table, first manufactured in 1949 and highlighted in a number of shelter magazines during the 1950's.

Ray Kennedy of Herman Miller believes there is no particular age, income or lifestyle that is attracted to Modern. Rather, there is a convergence of consumer interest—in some cases because they grew up with it, in others because they have never seen it before—that crosses all demographics, including income.

The 1950's represented a celebration of materials intricately woven into product, innovative uses of technology and an effort to do more with less: less materials but also less form. So says Richard Schultz, who designed award winning furniture in the 50's and 60's that is selling again today. Form is at the service of comfort and ergonomics, he says. With this approach, people are finding they don't need big, thick cushions any more, they can sit on stretched membranes and still have comfort.

Marlene Goldstein of MRG New York reports that buyers at the high end are beginning to clamor for original 1950's textile and wallpaper documents that feature organic geometrics, sputnik-inspired lines and washed back hues like Turquoise, Brown and Orange. But there is a market beyond time-tested artifacts.

At the designer level, Goldstein's rug collection for Saxony in 50's inspired organic patterns favors Neutrals like Beige, Putty and Grays with just a shot of bright color. The idea was to reinvent the patterns and motifs of the era through color—and it's working. The line has expanded form 10 to 18 sku's within one year.

Although there has been an explosion of interest in Contemporary and the following for Modern is growing fast, few suggest that entire rooms filled with Modern furnishings are the next step. Instead, there is an underlying notion that these looks, authentic or inspired, are taking their place in an eclectic mix, bringing a new focus to design, materials and technology in the process.



### Eames Storage Units from Herman Miller

Organic geometrics from Angela Adams



Eames Storage Units. These units have heavier legs than the originals, but the colors and refined plywood moldings are vintage

© 2000 MARKETING DIRECTIONS, INC. ANY REPRODUCTION OF THIS PUBLICATION IS A DIRECT VIOLATION OF FEDERAL COPYRIGHT LAW. THIS INCLUDES, BUT IS NOT LIMITED TO, COLOR COPYING, ANY OTHER PHOTOCOPYING OR FAXING, E-MAIL DISTRIBUTION OF COPY OR POSTING CONTENT ON THE INTERNET.

JUNE 2000

# MINIMALISM'S NEXT STEP

The proliferation of 1930's French Minimalism throughout the market has had an interesting affect on design as a whole. Everyone seems to be considering ways to pare back and simplify. At the same time, as these looks move from the very high end to more accessible price points, there is a movement to find fresh, untapped avenues for expressing simplified looks at the more exclusive levels. One of them will come from Sweden.

Just as Jean-Michel Frank was developing the French Minimalist style, Joseph Frank was taking things in a similar direction in Sweden. This 1920's movement, called Swedish Grace, brought a cleaner look and more interesting solutions to case goods.

In Sweden, Svenskt Tenn produced Joseph Frank's fabrics and furniture. These designs were the inspiration for a new collection, produced by Swedish Blonde, called Stockholm Grace; it will be introduced to the U.S. at the October High Point Furniture Market.

This collection combines faithfully reproduced and inspired elements from the Swedish Grace era. But authentic or adapted, the basic concepts are the same: simple design and high functionality. Silhouettes are clean and easy to live with. Pieces tend to be raised up off the ground with tapered legs that leave open spaces below. Pull-out ledges and pull-apart sections for hidden storage add versatility to tables and chests.

Decoration is discrete and begins with a clever use of wood. Medium/light birch pairs, contrasting grain directions and burled wood all create subtle patterning. The use of subdued paint colors like Putty with unpainted wood is an adaptation of the look which also adds interest. Other details:

- Wood slats
- Small pulls
- Gray Granite
- Zinc accents

Swedish Country has already gained a modest but growing foothold in the market as part of the expanding country mix that also includes Country French, English Country, Italian Country and even hints of American Country. The introduction of Swedish minimalist style will reinforce the Scandinavian connection going forward, opening the door to other styles from decades closer to today (think Danish Modern with a Swedish twist that pushes the envelope on materials).

---

# HIGH MOUNTAIN

High Mountain Style is the reincarnation of Southwest and Lodge that has been quietly reforming itself for the past couple of seasons. Its most noticeable statement in years came at the April High Point furniture market. from higher end makers who are reinforcing the forecast that this look will again be on-trend.

High Mountain distances itself from the past in several ways. It begins with an approach that is more casual and comfortable than rustic. Every element of the style— from sophisticated, layered wood finishes (with names like Latté) and deep, cushioned seating—speaks to a casual look which, like all of the most important trends of today, makes a more refined statement. Smooth surfaces and rounded forms for massive pieces (Spanish influences continue to linger in the background) take a giant step away from the crude birch bark and rusted iron surfaces that once defined the trend. Newness also comes from



**Stockholm Grace by Swedish Blonde**

From the Stetson collection at Vanguard



© 2000 MARKETING DIRECTIONS, INC. ANY REPRODUCTION OF THIS PUBLICATION IS A DIRECT VIOLATION OF FEDERAL COPYRIGHT LAW. THIS INCLUDES, BUT IS NOT LIMITED TO, COLOR COPYING, ANY OTHER PHOTOCOPYING OR FAXING, E-MAIL DISTRIBUTION OF COPY OR POSTING CONTENT ON THE INTERNET.

# THE TRENDCURVE

JUNE 2000

> **High Mountain is a look that is being accepted from Maine to Montana. Woods are medium colored oak with visible grain or have sophisticated layered finishes. Wicker is also medium colored. Metal is rounded, not square like in the 1990's. Accents are Silver or (increasingly) Gold.**

color; High Mountain shies away from old Hunter/Burgundy or Slate Blue/Mauve combinations in favor of Reds, Browns, Golds and Blacks. These are color families that are enjoying broad acceptance and this will help to quickly propel the trend into the mainstream.

Large scale plaids work well here, especially when interpreted in wool. Navajo blanket motifs, also found in wool vs. yesterdays prints, are more likely to include multi-colored stripings or zigzags than ikat motifs. The ikats of 1980's Southwest and 1990's Lodge are not completely gone, but a new twist that brings in South American Indian geometrics and icons such as Llamas (think Peru) is a better option

that adds a global flavor to the look. In textiles these types of patterns are appearing in chenille and bouclé, fabrics that, like wool, have a heavier feeling which works well in this masculine style.

A wide variety of styles and treatments ensures that the play of textures, which began with fabrics and wood finishes, continues with leather. Various treatments used together (aniline dyed, nubuck, woven looks, embossing, distressing, antiquing, etc.) enhance the options beyond fabric/leather or leather/wood or wicker. Details and trim are key:

- Braiding leather and suede together
- Slashed leather piping
- Photo transfer on leather accent items
- Cartridge shell ends used like nail head trim

Why High Mountain today? First, because it offers a real alternative to the myriad of feminine styles proliferating in the market. Second, High Mountain is a solid alternative to Minimalism, which has influenced many product designs in the recent past. And finally, in the midst of so many country styles from Europe, High Mountain brings us back to the familiarity of American style—something that will grow more important in the coming two years.



High Mountain Style from Wesley Hall

## OF NOTE:

Our web site has been completely redesigned. Visit us at http://www.trendcurve.com for the latest in Free Trend Information, the editor's recommended reading list, our updated trade show calendar and more! Let us know what else you would like to see by emailing us at info@trendcurve.com.



**Marketing Directions, Inc.**
**7205 Ohms Lane, Suite 175**
**Minneapolis, MN 55439**

The Trend Curve is published by Marketing Directions, Inc. it is offered six times yearly with information from major markets and trade shows important to the home furnishings industry. Subscription is available at $199.00 per year when delivered within the U.S., $269.00 for all other countries. Back issues ($15 each) and custom publications are available.

(952) 893-1245 or call toll-free (800) 531-6614
Fax (952) 893-1264
E-mail: info@trendcurve.com
WWW :http://www.trendcurve.com
The Trend Curve -ISSN# 1080-1324

Senior Editor: Michelle Lamb
Editorial Correspondents: Mary Louise Hawkins, Lee Klose, Sara Saferstein

While every effort has been made to provide accurate information, Marketing Directions, Inc. cannot be held accountable for any error or omission and there is no warranty or representation, express or implied, that the information provided in this publication is definitive. Marketing Directions, Inc. is not responsible for any costs, expenses or damages, actual or consequential, resulting from the use of this information.

**ABOUT MICHELLE**

Michelle Lamb, CMG, is the founder and chairman of Marketing Directions, Inc., publishers of The Trend Curve and numerous special reports covering major markets. Marketing Directions, Inc. informs national and international manufacturers and retailers on industry trends.

© 2000 MARKETING DIRECTIONS, INC. ANY REPRODUCTION OF THIS PUBLICATION IS A DIRECT VIOLATION OF FEDERAL COPYRIGHT LAW. THIS INCLUDES, BUT IS NOT LIMITED TO, COLOR COPYING, ANY OTHER PHOTOCOPYING OR FAXING, E-MAIL DISTRIBUTION OF COPY OR POSTING CONTENT ON THE INTERNET.

Case 1:01-cv-00793-SHR    Document 30    Filed 04/01/2002    Page 35 of 59

# TRENDCURVE



TOMORROW'S TRENDS TODAY

Everyone is talking about some kind of smaller furniture. Some are making traditionally scaled pieces for apartments or smaller homes. Others are playing with dimension, retaining the length of a sofa or chair while reducing its overall height (depth is unchanged; at Bernhardt it's 45", the deepest possible to still have a deliverable piece). The number of seating positions stays the same while the distance from the floor shortens.

The difference is small—18" vs. 20" from Century—yet it comes at a time when this company is also taking a stylistic approach to smaller pieces. Century's Omni group was designed "...for people who crave simplicity ...d have a deep desire to eliminate excess from their lives." It's a minimal approach where bulbous curves give way to lower and tighter profiles; details are modest so the forms, finishes and fabrics carry the message.

Going smaller is catching on in another way: grouping. Conversation pits—smaller seating units assembled into larger vignettes—are slowly being rediscovered. Bunching tables have just reappeared (Hickory White increased the scale and added a drawer to update) after nearly 30 years. Bunching cabinets are new again as well.

Grouping smaller pieces together not only gives maximum flexibility to customize but makes a different, though no less powerful, visual statement. It also makes smaller pieces desirable to a broader audience as they can form large or small combinations. That means smaller will begin to be viewed as better in the coming two years.



Brights in Gyro ottomans from Jena Hall for American Leather

# COLOR

There is no doubt that color is lightening as a whole but this is particularly visible in the midrange. The most compelling introductions of the past several months have been in subtle middle value hues that are lighter than Spice Colors, the volume mid-value palette of the 1990's, but more colorful than pastels. As a result, even paler colors are beginning to look more interesting for 2001 and beyond.

Although Blues have had a slow start, the recent introduction of Dream Boat Blue—a completely new mid-value color—has given impetus to their return. This hue was presented in many showrooms but one of the broadest statements came from Raymond Waites designing for LaneVenture, Tyndale/Frederick Cooper and Thief River Linen (upholstery, lighting, pillows). The color was well received in all categories but particu-

larly in lighting. Dream Boat Blue will be among the strongest options in this family as Blues return. It is highly recommended.

The Red family is still building but is changing its personality as it does so. The result is a significant number of individualized statements that exist concurrently as the market transitions from one type of color to another for 2001:

- Warm mid-value Reds are mainstream with Red/Gold a volume combination; the high end is shifting cooler

- Rose, with the help of Brown to differentiate it from its 1980's past, is appearing too often not to notice

## INSIDE:
- Color Update
- Wood Notes
- Combined Trends from the High Point Furniture Market, ICFF and the New York top and Domestics Markets

© 2000 MARKETING DIRECTIONS, INC. ANY REPRODUCTION OF THIS PUBLICATION IS A DIRECT VIOLATION OF FEDERAL COPYRIGHT LAW. THIS INCLUDES, BUT IS NOT LIMITED TO, COLOR COPYING, ANY OTHER PHOTOCOPYING OR FAXING, E-MAIL DISTRIBUTION OR COPY OR POSTING CONTENT ON THE INTERNET.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

YORK WALLCOVERINGS, INC.,            :
                                     :
                      Plaintiff,     :        NO. 1:CV-01-0793
                                     :
            v.                       :        (The Hon. Sylvia H. Rambo)
                                     :
S.A. MAXWELL COMPANY, INC.           :
and JAIMA BROWN,                     :
                                     :
                      Defendants.    :

## AFFIDAVIT OF ALBERT ROBIN IN OPPOSITION
## TO MOTION FOR A PRELIMINARY INJUNCTION

STATE OF NEW YORK    )
                                : ss.:
COUNTY OF NEW YORK)

Albert Robin, being duly sworn, deposes and says:

1.    I am the attorney for Defendants herein and I am fully familiar with all of the

proceedings heretofore had herein and all of the matters hereinafter set forth.

2.    I make this affidavit to make of record some of the admissions made by

Plaintiff in discovery requests and in depositions, to set forth the status of the Declaration

of William Carroll, and to set forth some of the chronology of this case.

3.    Attached hereto as Albert Robin Exhibit 1 are copies of Definitions C and D

to Plaintiff's Interrogatories Addressed to Defendants and Definitions 3 and 4 to

Plaintiff's Request for Production of Documents Addressed to Defendants, both dated

October 2, 2001.  By defining the "Maxwell Wallpaper" and "Maxwell Border" as

referring to "both color combinations" of the wallpaper and border manufactured by

Maxwell and referenced in Paragraphs 20 and 21 of the Complaint, they make it clear

"Exhibit C"

that only two of the color combinations manufactured by Maxwell are placed at issue in this proceeding.

4.  Albert Robin Exhibit 2 will be a copy of page 15 from the transcript of the deposition of Carl Vicci, York's President, in which he admits that there is no irreparable harm.  Since this transcript has been designated "Confidential" by York and York is thus far unwilling to release this page from confidentiality, it will be submitted to the Court at the hearing.

5.  Attached hereto as Albert Robin Exhibit 3 are copies of pages 27 and 56-59 from the transcript of the deposition of Stanley Thomas, York's Assistant Secretary and Assistant Treasurer, confirming that Maxwell's alleged infringement first came to York's attention in January of 2001, that Mr. Carroll still continues to be an independent designer employed by York from time to time and that he believed that Mr. Carroll did not copy the York designs.

6.  Attached hereto as Albert Robin Exhibit 4 is a copy of pages 17-18 of the transcript of the deposition of Elizabeth F. Lydon, York's Product Development Manager, who admitted that York designers use competitors' wallcovering as references and that there is nothing wrong with using competitors' wallcoverings as references.

7.  Over the past several weeks I have talked on the telephone several times with William Carroll, the independent designer who created the allegedly infringing designs, and met with him in Rexdale, Ontario, Canada.  While I understood that I would have a declaration from him in time to submit to the Court with the opposing papers, it now appears that for several reasons, including the fact that today and Monday are holidays in Canada, he will not furnish me with such a declaration until next week or the week after.

2

## DEFINITIONS AND INSTRUCTIONS

A.    "Maxwell" means and includes S.A. Maxwell, Inc. and other persons acting, having acted or purporting to act on behalf of S.A. Maxwell, Inc.

B.    "Brown" means and includes Jaima Brown and other persons acting, having acted or purporting to act on behalf of Jaima Brown.

C.    "Maxwell Wallpaper" refers to and includes both color combinations of the wallpaper manufactured by Maxwell and referenced in Paragraphs 20 of Plaintiff's Complaint.

D.    "Maxwell Border" refers to and includes both color combinations of the border manufactured by Maxwell and referenced in Paragraph 21 of Plaintiff's Complaint.

E.    "Maxwell's Sample Book" refers to and includes the sample book entitled Sesquicentennial Collection, referenced in Paragraph 22 of Plaintiff's Complaint.

F.    "You" and/or "your" means and includes Maxwell and/or Brown and/or other persons acting, having acted or purporting to act on behalf of Maxwell.

G.    "Plaintiff" means and includes Plaintiff York Wallcoverings, Inc.

H.    To the extent that less than both of you are able to answer any particular Interrogatory, you shall identify which answering party is answering the particular Interrogatory and the knowledge possessed by each non-answering party.  If the response is not so identified, it will be presumed that all answering parties are answering the particular Interrogatory and are personally aware of the information provided therein.

1015850.1

2

"Albert Robin Exh. 1"

## DEFINITIONS AND INSTRUCTIONS

(1)    "Maxwell" means and includes S.A. Maxwell, Inc. and other persons acting, having acted or purporting to act on behalf of S.A. Maxwell, Inc.

(2)    "Brown" means and includes Jaima Brown and other persons acting, having acted or purporting to act on behalf of Jaima Brown.

(3)    "Maxwell Wallpaper" refers to and includes both color combinations of the wallpaper manufactured by Maxwell and referenced in Paragraphs 20 of Plaintiff's Complaint.

(4)    "Maxwell Border" refers to and includes both color combinations of the border manufactured by Maxwell and referenced in Paragraph 21 of Plaintiff's Complaint.

(5)    "Maxwell's Sample Book" refers to and includes the sample book entitled Sesquicentennial Collection, referenced in Paragraph 22 of Plaintiff's Complaint.

(6)    "You" and/or "your" means and includes Maxwell and/or Brown and/or other persons acting, having acted or purporting to act on behalf of Maxwell.

(7)    "Plaintiff" means and includes Plaintiff York Wallcoverings, Inc.

(8)    "Document" means and includes any kind of written, typewritten or printed material whatsoever, including but not limited to papers, agreements, contracts, notes, memoranda, comments, correspondence, letters, telegrams, statements, invoices, record books, reports, studies, minutes, records, accounting books, transcriptions and recordings of which you have any knowledge or information, whether in your possession or under your control, relating to or pertaining in any way to the subject matters in connection with which it is used, and includes,

1016132.1

2

Exam./Robin - Thomas                    2

1          MR. ROBIN:  I didn't mention counsel.  If he

2     had mentioned counsel, I would not have asked the

3     question.

4          MS. McGUIRE:  Okay.

5  BY MR. ROBIN:

6  Q.   I mean, outside of the presence of your counsel.

7  A.   Yes, we did.

8  Q.   And do you recall when this was?

9  A.   Not specific dates, but certainly in the early

10     part of January of 2001.

11  Q.   Do you know when this lawsuit was filed?

12  A.   I don't know the specific date, no.

13  Q.   According to my copy of the Complaint, it was

14     filed on May 7th, 2001.

15          So, at least our chronology now is sometime

16     in January you saw the wallcovering book;

17     February 9th you filed your copyright

18     applications; sometime after that you obtained a

19     copy of the Maxwell book, Sesquicentennial book,

20     and on May 7th counsel filed suit.

21          Am I correct in that general chronology?

22  A.   Generally, that's correct.  The only correction I

23     would make to what you said is that in early

24     January we saw the Maxwell book.  We, in fact,

25     saw the Maxwell ad.

"Albert Robin
Exh 3"

Exam./Robin - Thomas                          5

1          of Tierkelly Designs, that he drew the Maxwell

2          pattern.

3     Q.   And he has prior to that time and subsequent to

4          that time worked for York?

5     A.   Prior to my conversation, yes.

6     Q.   And prior to then and he still continues to be an

7          independent designer employed by York from time

8          to time?

9     A.   Yes.

10    Q.   How did you have occasion to talk to Mr. Carroll?

11         Did he call you?

12    A.   Yes, he did.

13    Q.   And do you know why he selected you to talk to?

14    A.   He originally called a stylist who he was working

15         for in our studio and asked who he should talk

16         to.

17    Q.   Okay.

18    A.   And she had recommended to talk to myself or Mr.

19         Vizzi.

20    Q.   So, tell me about that conversation.

21             MS. McGUIRE:   The one when Bill Carroll

22         called Stan?

23    BY MR. ROBIN:

24    Q.   When Bill Carroll called you.  Or did you call

25         him?

1       with Maxwell.  And what he had come to understand

2       it was a problem with Maxwell and his elephant

3       design and York.  And he indicated that he had

4       not worked for Maxwell for a number of months,

5       and he had just begun a relationship with York.

6    Q.  Did he tell you that anything that Mr. Milrad

7       wrote down was untrue?

8    A.  No.

9    Q.  Did he tell you anything about the design that he

10      did for Maxwell?

11   A.  Yes.

12   Q.  What did he tell you?

13   A.  He said that he used items that Jaima had sent

14      him, and that he had some references of his own

15      that he used to compile a design.  I believe he

16      mentioned a fabric that he had got from Jaima and

17      some various old papers and a dinosaur book I

18      believe that he had had in his possession.

19   Q.  Did he tell you that he did not copy the York

20      designs?

21   A.  Yes, he did.

22   Q.  Did you believe him?

23   A.  I believed that he did not copy the York design.

24      He had indicated in his conversation to me that

25      he did not -- he had not seen the York design.

Exam./Robin - Lydon                          17

```
 1          MR. ROBIN:  My question was probably
 2      inartful.
 3  BY MR. ROBIN:
 4  Q.   Do you have an understanding of which was said,
 5      or do you not have any understanding at all,
 6      whether it was look-alike or like?
 7  A.   I would not want to clarify that.  I think you
 8      would have to speak to Mr. Crouse.
 9  Q.   Let me ask you then what you told Mr. Brown
10      because that's the different story.
11  A.   Do you know what?  I don't recall whether I told
12      him it was look-alike or Ron Redding-like
13      product.  I don't know.
14  Q.   Are you familiar with how the designers at York
15      create -- the ones that create designs -- the
16      designs they do themselves as opposed to
17      purchased designs?
18  A.   Yes.
19  Q.   Do you know what references they use?
20  A.   Yes.
21  Q.   Do they ever use competitors' wallcovering as
22      references?
23  A.   Yes.
24  Q.   Do they also use York wallcovering as references?
25  A.   Correct.
```

"Alberto Robin
Exh. 4"



**Decorative Arts**



# A REGAL BOUQUET

*A dazzling new collection of fabrics draws inspiration from the vast archive of 18th- and 19th-century art at London's Royal Botanic Gardens, Kew*

BY STEPHANIE RANK

**The story of how London's Royal Botanic Gardens** provided inspiration for a line of American furnishing fabrics begins in the 18th century with Augusta, Princess of Wales. After the death of her husband in 1751, the princess invested an estimated 40,000 pounds—nearly her entire fortune—to create a botanical garden at Kew, her London estate on the banks of the Thames. She was guided in this enterprise by an ambitious and authoritative mentor, Lord Bute (later a prime minister under King George III), who instructed that the garden "contain all the plants known on earth."

To create a setting for this tall horticultural order, Bute completely rearranged what he called Kew's "blandly flat land," raising mounds, shaping hollows and slopes, adding a lake, and planting drifts of trees to create silhouettes and perspectives. Elaborate adornments followed: paths and parterres; extravagant displays of shrubs and flowers; benches, statuary, and a scattering of follies designed by the royal architect, Sir William Chambers. Soon Kew topped Georgian England's list of greatest gardens.

Today, the Royal Botanic Gardens, Kew—still England's most magnificent—are >

*An exquisite botanical rendering of a palm (far left) is one of many by Indian artists to illustrate* Plants of the Coast of Coromandel *(1798), a compendium of existing plants. The tree now appears, reconfigured, as part of Brunschwig's Botanical cotton print. It can be clearly adorning on this Victorian*

"Albert Robin —





Exh. 7



GURNEY







"Exhibit 8"













# Chronology

| | |
|---|---|
| 01/12/99 | York purchased elephant sidewall design from Banefshe Schippel, a UK company, or Tricia Scullin, an individual residing in the UK. |
| Spring '99 | York in-house design staff adapted elephant sidewall design to elephant border design. |
| 10/25/99 | York's Portfolio Sample book, which included 4 colorways of the elephant sidewall design and 4 colorways of elephant border design, published. |
| 06/14/00 | Maxwell purchased its elephant, palm and scroll sidewall design and elephant, palm and scroll border design from Bill Carroll, an independent designer. |
| 01/??/00 | York saw trade advertisements for Maxwell Sesquicentennial Sample Book, which included elephant, palm and scroll design on cover and 3 colorways of sidewall and border in collection. |
| 01/31/01 | Complete Maxwell Sesquicentennial Book first distributed. |
| 02/??/01 | York obtained Maxwell Sesquicentennial Sample Book. |
| 02/09/01 | York filed applications for registration of claim of copyright in its |

(1) elephant sidewall design, stating that it was a purchased design and that Banefshe  Schippel was its author as a work for hire, and

(2) elephant border design, stating that it was a derivative work of the elephant sidewall design.

[By not seeking copyright registration within 90 days of first publication, or prior to Maxwell's alleged infringement, York forfeited its right to obtain statutory damages or attorney fees for the alleged infringement.]

| | |
|---|---|
| 02/12/01 | Copyright registrations issued to York. |
| 05/04/01 | York attorney wrote to Maxwell's president notifying him the for first time of its claim and enclosing courtesy copy of complaint naming both Maxwell, and Jaima Brown, a Maxwell employee, as Defendants. |
| 05/07/01 | Complaint alleging that two of three colorways of Maxwell elephant, palm and scoll sidewall and two of three colorways of Maxwell elephant, palm and scroll border infringed the York sidewall design copyright authored by Banefshe Schippel and the York border design copyright derived form the sidewall copyright.  [The complaint has never been amended.] |
| 06/12/01 | Complaint served. |
| 06/__/01 | Defendants' time to answer extended to 07/23/01. |
| 07/23/01 | Defendants' answer and Brown counterclaim for trade libel served and filed. |
| 08/16/01 | Joint Case Management Plan filed.  [There is no mention by Plaintiff in this document of any need for a preliminary injunction or any intimation that such relief would be sought.] |
| 08/23/01 | Case Management Order entered. [There was no provision in this order for any motion for a preliminary injunction.] |
| 08/13/01 | Plaintiff served motion to dismiss Brown's trade libel counterclaim. |
| 09/22/01 | Plaintiff served brief in support of motion. |
| 09/06/01 | Defendant Brown served opposition to motion. |
| 09/17/01 | Plaintiff served reply. |
| 10/02/01 | Plaintiff served interrogatories. |
| 10/02/01 | Plaintiff served request for production of document. |

"Exhibit 9"

| | |
|---|---|
| 10/02/01 | Plaintiff served Rule 26(a)(1)(D) disclosure. |
| 10/11/01 | Defendants served Rule 26(a)(1)(D) disclosure. |
| 10/22/01 | Order entered dismissing counterclaim. |
| 10/25/01 | Defendants served request for production of documents. |
| 11/05/01 | Defendants served answers and objections to interrogatories. |
| 11/05/01 | Defendants served response to request for production. |
| 12/03/01 | Defendants served corrected response to request for production. |
| 12/06/01 | Plaintiff took discovery deposition of Jaima Brown. |
| 01/17/02 | Mediation held.  [Again no mention was made in Defendants' presence of any need for a preliminary injunction.] |
| 01/31/02 | Plaintiff filed Supplemental Copyright Registration informing the Copyright Office that author of York elephant sidewall design was not Banefeshe Schippel but Tricia Scullin. |
| 02/12/02 | Supplemental copyright registration issued to York. |
| 02/27/02 | Plaintiff served request for Order to Show Cause. |
| 03/01/02 | Court entered Order treating Application as Motion for Preliminary Injunction and set briefing schedule and hearing date. |