

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **YORK WALLCOVERINGS, INC.,** | : | CIVIL NO.1:CV-01-0793 |
| **Plaintiff** | : | |
| v. | : | |
| **S.A. MAXWELL COMPANY, INC. and JAIMA BROWN,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff, York Wallcoverings, Inc. ("York"), is seeking temporary injunctive relief until trial of its claim against Defendants S.A. Maxwell Company, Inc. ("Maxwell") and Jaima Brown ("Brown"). Plaintiff claims that Defendants violated Plaintiff's copyrights in certain wall covering and border designs. The court has jurisdiction over these claims pursuant to 28 U.S.C. § 1338(a), which vests federal courts with exclusive jurisdiction over civil actions relating to patents, copyrights, and trademarks. On May 7, 2001, Plaintiff filed suit in the instant matter. On February 28, 2002, Plaintiff filed a motion for a rule to show cause of why Defendants should not be preliminarily enjoined from marketing and selling the wall coverings and borders at issue in this dispute. By an order dated March 1, 2002, the court construed Plaintiff's motion as a motion for preliminary injunction based on Rule 65 of the Federal Rules of Civil Procedure. On April 30, 2002, the court held a hearing on the motion. The parties have thoroughly briefed the issue, and the matter is ripe for disposition.

I.        **Background**

Based on the parties' submissions to the court and the evidence produced during the court's hearing, the following is the background to the instant motion. Plaintiff York is a company engaged in the business of designing and manufacturing wall coverings and borders. Defendant Maxwell is engaged in the same business and is one of York's competitors.

In January of 1999, York purchased an assignment for a wall covering design from Banafshe Schippel, a design gallery operating out of Frankfurt, Germany. The design featured ornamentally dressed Indian elephants. The assignment indicated that Patricia Scullin created the design. York incorporated the design into wall coverings and borders which feature walking Indian elephants wearing ornamental garb and anklets. Half of the elephants have their trunks raised, while the other half have their trunks lowered. Additionally, the background of the designs contain faded lattice work and illustrations of leafy foliage dispersed between the repeating elephant pattern.

York filed two certificates of registration with the United States Copyright Office relating to the elephant wall covering and border. The certificates are effective as of February 12, 2001 and list Banafshe Schippel as the author of the design. York later amended the certificates on February 12, 2002, when it learned that Scullin was an independent contractor, rather than a Banafshe Schippel employee. The amendment reflects this information.

In October of 1999, York placed the wall coverings and border designs on the market as part of its "Passport Collection." The cover of the Passport Collection features an illustration of a single ornamentally dressed Indian elephant.

The elephant designs have enjoyed substantial success in the market as some of York's best selling products. Generally, wall coverings and border designs have a three year commercial lifetime. Because of their immense popularity, the elephant designs will appear in York's new collection, thus extending the designs' circulation through the Fall of 2005.

In January 2001, Defendant Maxwell began distributing its "Sesquicentennial Collection" which contained wall cover and border designs that also prominently displayed Indian elephants. Like the cover for York's Passport Collection, the cover of Maxwell's Sesquicentennial Collection prominently features its elephant design. Like York's wall covering designs, the Maxwell wall covering designs feature vertically repeating patterns of ornamentally dressed Indian elephants with faded lattice work in the background. The Maxwell design, however, features plant scrolls and palm trees dispersed between the depictions of the elephants, instead of the leafy foliage employed in the York design. The elephants in the Maxwell border designs are separated by palm trees only. In the Maxwell design, all of the elephants have their trunks raised.

Under the auspice of Jaima Brown, Maxwell's Director of Design, independently-contracted artist William Carroll composed Maxwell's elephant design. As part of the design process, Brown gave Carroll a detailed design brief to guide him. In the design brief, Brown included several pieces of reference materials, including York's elephant wall covering design. Carroll's original design is almost identical to the finished Maxwell product except that, like the York design, half the elephants have their trunks raised. In the final Maxwell design, all

elephants have their trunks raised. Brown made this change when she put together the final Maxwell designs.

York claims that Maxwell copied its elephant wall covering and border designs and is using the similar designs to confuse consumers into buying Maxwell's products. York's wall covering design has a suggested retail price ("SRP") of $35.99 per single roll of paper. Maxwell's wall covering design has an SRP of $26.99 per single roll of paper. A five yard spool of York's border design has an SRP of $32.99, while the same quantity of Maxwell's border design has an SRP of $26.99. Thus, York contends Maxwell's copying is allowing it to pilfer York's customers by offering a copied product for a lower price.

York maintains that it is considered a high-end designer of wall coverings and borders. It invests a substantial amount of capital in procuring and producing original design work through the purchase of archived design collections and its large in-house design studio. Due to these extensive collections, York has obtained a reputation for having unique designs which has led to its success in the field. By copying York's work, Maxwell is able to sell a similar product for a lower price by avoiding the incurrence of the substantial investment in procuring and/or producing original design work. Moreover, by copying York designs, Maxwell is able to diminish York's reputation for unique designs.

II.     **Legal Standard: Motion for Preliminary Injunction**

York seeks preliminary injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure based on its claims that Maxwell and Brown violated York's exclusive copyright. As the party seeking injunctive relief, York

4

bears the burden of proof. *Mettler-Toledo, Inc. v. Acker*, 908 F. Supp. 240, 245 (M.D. Pa. 1995). The traditional four-factor test for granting a preliminary injunction is as follows: (1) the likelihood that the plaintiff will prevail on the merits; (2) the extent to which the plaintiff will be irreparably harmed by denial of relief; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999) (citing *ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc)). "The injunction shall issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *New Jersey Hosp. Ass'n v. Waldman*, 73 F.3d 509, 513 (3d Cir. 1995) (quoting *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods.*, 963 F.2d 628, 632-33 (3d Cir. 1992)).

### III.    Discussion
#### A.    Likelihood of Success on the Merits

To prevail on a claim for copyright infringement, the plaintiff must establish: (1) ownership of a valid copyright; and (2) "copying" by the defendant. *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1231 (3d Cir. 1986). In this case, Maxwell denies both that York possesses valid copyrights to the wall covering and border designs and that York can establish that Maxwell copied its design.

##### 1.    Validity of Copyright

Pursuant to 17 U.S.C. § 410(c), "certificates of registration issued by the U.S. Copyright Office constitute prima facie evidence of the validity and

ownership of the material." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 290-91 (3d Cir. 1991); *see also Williams Electronics, Inc. v. Arctic Int'l, Inc.*, 685 F.2d 870, 873 (3d Cir. 1982). "The presumption flowing from § 410(c) is not an insurmountable one, and merely shifts to the defendant the burden to prove the invalidity of the plaintiff's copyright." *Masquerade Novelty v. Unique Indus.*, 912 F.2d 663, 668 (3d Cir. 1990).

At the hearing, York produced certified copies of two copyrights. One of the copyrights (Pl. Ex. 1,) bears the title "Elephant Sidewall," and the other (Pl. Ex. 3,) is entitled "Elephant Border." Both documents state that the works have been registered as of February 12, 2001. Additionally, York produced a certified copy of a supplementary registration, dated February 12, 2002, to the Elephant Sidewall certificate of registration. (Pl. Ex. 2.) The supplement adds Patricia Scullin as an author of the work.

Maxwell denies the validity of these documents. It contends that because York has altered the information concerning authorship of the copyrighted work, it is not entitled to the presumption of validity.[1] Maxwell argues that York's failure to include Scullin as an author may have been inadvertent, but it was material. According to Maxwell, if Scullin was the original author and the original copyright certificate stated that Banafshe Schippel was the author, York is not entitled to the § 410(c) presumption of validity because the assignment of rights and

---

[1] Maxwell also briefly contends that the documents are merely copies of applications for certificates of registration, and are not certificates of registration themselves. (Def. Br. in Opp. to Mot. for Prelim. Inj. at 3.) Maxwell, however, failed to present any argument or evidence that would support such a finding. Moreover, the court notes that both documents bear the title "Certificate of Registration," and Maxwell's own summation of the chronology of events in this case indicates that the Copyright Office issued York copyrights for the designs at issue in this case. (Def. Br. in Opp. Mot. for Prelim. Inj. Ex. 9 at 1 ("02/12/01 Copyright registrations issued to York.").)

6

the original copyright application do not match with respect to authorship. Therefore, York must present evidence from Scullin as to the design's creation and originality. Because York has not provided any such testimony, Maxwell contends, it has failed to demonstrate that it will succeed on the merits.

In support, Maxwell relies upon the following language from a footnote in the Third Circuit's decision in *Masquerade Novelty*: "It may be that the correct approach in situations where there has been a material, but inadvertent omission, is to deprive the plaintiff of the benefits of § 410(c) and to require him to establish the copyrightability of the articles he claims." 912 F.2d at 668 n.5. In the body of the text, however, the court explicitly states, "this appeal can be resolved without deciding whether an inadvertent omission of material information from a submission to the Copyright Office . . . deprives the copyright owner of its § 410(c) presumption." *Id*. Therefore, the cited footnote is mere dicta.

Furthermore, the court does not agree with Maxwell's legal analysis. Under the law, York, upon providing certified copies of the relevant certificates of registration, is entitled to the presumption of their validity. At this point, the burden switches to Maxwell to present evidence rebutting the presumption. Instead, Maxwell seeks to reverse this by alleging that the certificates of registration are invalid due to an error in authorship, thus placing the burden on York to establish the copyrights' validity. Maxwell offers no legal authority supporting such a result. The certificates of registration are presumptively valid.

Moreover, Maxwell's contention regarding the authorship of the designs is insufficient to overcome the presumption. An omission of authorship, like the one present in this case, is not a material omission. Absent evidence of

7

fraud on the part of the copyright holder, "an inadvertent and immaterial misstatement will not invalidate a copyright registration." *Raquel v. Education Mgmt. Corp.*, 196 F.3d 171, 177 (3d cir. 1999), *vacated on other grounds by* 531 U.S. 952 (2000); *see also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1161 (1st Cir. 1994); *Eckes v. Card Prices Update*, 736 F.2d 859, 861-62 (2d Cir. 1984). In these situations, courts are quite lenient, upholding the presumption of validity even when the plaintiff has misidentified the work's author. *See, e.g., Thomas Wilson & Co. v. Irving J. Dorfman Co.*, 433 F.2d 409, 412 (2d Cir. 1970) (upholding validity of copyright where certificate listed president of corporation as author of the work, instead of the corporation itself); *Morelli v. Tiffany Co.*, 186 F. Supp.2d 563, 566 (E.D. Pa. 2002) (same); *Testa v. Janssen*, 492 F. Supp. 198, 201 (W.D. Pa. 1980) (upholding validity where certificate listed the author's assignee).

In this case, Maxwell does not present any evidence of wrongdoing. Additionally, the assignment – which it now contends cannot support the presumption of validity – lists Patricia Scullin as the author on behalf of Banafshe Schippel. Scullin also signed this document. Therefore, the court fails to see how the fact that York has now amended the copyright to list Patricia Scullin as an additional author, can serve to invalidate the certificate of registration. The misstatement was immaterial and inadvertent. The fact that there may have been a technical error in the certificates does not rebut the presumption of validity in this case.

### 2. <u>Copying</u>

"As it is rarely possible to prove copying through direct evidence, . . . copying may be proved inferentially by showing that the defendant had access to the

allegedly infringed copyrighted work and that the allegedly infringing work is substantially similar to the copyrighted work." *Whelan Assocs.*, 797 F.2d at 1232. In this case, it is undisputed that Brown had access to York's design. It is also undisputed that she included a sample of the York design in the detailed design brief that she sent to Carroll. Therefore, the sole issue as to copying is whether there is a substantial similarity between the York and Maxwell designs.

Substantial similarity has its own test containing two determinations, both of which must be met in order for the plaintiff to prove copying. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d at 291. First, "the extrinsic test" requires the plaintiff to prove, through expert testimony and a visual comparison, "whether there is sufficient similarity between the two works in question to conclude that the alleged infringer used the copyrighted work in making his own." *Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 914, 917 (3d Cir. 1975). Second, "the intrinsic test" requires that the fact-finder determine from a lay perspective whether the copying was an unlawful appropriation of the copyrighted work. *Ford Motor Co.*, 930 F.2d at 291. If the plaintiff satisfies these two tests, then a rebuttable presumption of copying arises. *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982).

In the instant matter, York presented the testimony of its Vice President of Design, Ronald Redding. He testified as to the many similarities between the two designs. Additionally, he pointed out the slight differences between the two designs to which the lay eye might be ignorant. The overwhelming similarities between the two designs and the lack of any significant stylistic differences led him to conclude that Maxwell used the York design in drawing its elephant designs. In short, the

court finds this testimony sufficient to satisfy the extrinsic test of substantial similarity given the fact that, although employed for commercial purposes, the design is an artistic work entitled to broad copyright protection. *Ford Motor Co.*, 930 F.2d at 295.

Additionally, under the intrinsic test, it appears that there is a substantial likelihood that the fact-finder would conclude that the Maxwell design is an unlawful appropriation of the York design. Upon a cursory visual examination, it appears that the two designs have much in common. They both feature repeating patterns of walking Indian elephants dressed in ornamental attire. Additionally, both contain latticed backgrounds. In both designs, the elephant illustrations are separated by illustrations of vegetation, albeit the York design features leafy foliage and the Maxwell design employs palm trees and leaf scrolls. All elephants in the Maxwell design have their trunks raised, while only half of the elephants in the York design have their trunks raised.[2] However, these differences are minimal in the face of the overwhelming similarities and general aesthetic feel of the two designs. Although the court is not prepared to state definitively one way or the other at this juncture, it appears that there is a substantial likelihood that the finder of fact would conclude that the two designs are so substantially similar to support the inference that Maxwell unlawfully appropriated the design.

The burden now shifts to Maxwell to demonstrate that the design was the product of independent creation. *See Original Appalachian Artworks*, 684 F.2d at 829. The more similar the two works are, the more creative the differences in the

---

[2] As previously stated, in the original draft of the Maxwell design, only half of the elephants had their trunks raised. This was identical to the York design.

allegedly infringing design must be in order to support a finding of independent creation. *Universal Athletic Sales Co.*, 511 F.2d at 908. In support of its position, Maxwell presented evidence that the York design was only one sample in an extensive design brief that Brown provided to Carroll. The design brief also contained fabric samples and other wall coverings. Yet, of all of these samples, the Maxwell design most resembles the York design.

      Simply put, the fact that Brown included other artistic samples in her design brief is not persuasive given other facts that weigh in favor of finding that copying occurred. York's design was on the market before Brown instructed Carroll to put together a design. Brown included a sample of the York design in her design brief instructing Carroll to draw up an elephant design similar to the samples included in the design brief. Carroll likewise admits to having the York sample in his possession when he came up with the Maxwell design. Although the design brief also calls for illustrations of other animals, such as deers and tigers, Carroll never included these animals in any of his design drafts. Furthermore, Carroll composed a draft design featuring both elephants and zebras. On Brown's instruction, however, he removed the zebras from the design because Brown felt that the zebras made the design look too cluttered. These facts, taken in the totality, do not indicate that Brown and Carroll came up with the Maxwell design on their own using the York design as a mere reference amongst many such designs.

      Also, the differences in the Maxwell design are insufficiently creative to deem it an independent creation. In some cases, if the difference between the original and subsequent designs involves substantial creativity, the subsequent design will be deemed an independent creation worthy of its own copyright

protection. *See id.* at 908 (quoting Nimmer on Copyright at § 10.2 ("It appears, then, that there is a reciprocal relationship between creativity and independent effort. The smaller the effort (*i.e.* two words) the greater must be the degree of creativity in order to claim copyright protection.")). In this case, the differences between the two designs are neither numerous nor drastic. In the Maxwell design, the elephants are drawn with more detail and repeat on a slightly smaller scale. Additionally, Maxwell's designs contain leaf scrolls and palm trees instead of leafy bunches of vegetation. These very modest differences are insufficient to establish independent creation.

In summation, York has established that it owned valid copyrights for its design. Additionally, York presented evidence establishing a prima facie case of copying. Given these facts, the court concludes that there is a substantial likelihood that York will prevail on its copyright infringement claim at trial.

### B. <u>Irreparable Harm</u>

The second prong of the preliminary injunction standard requires York to prove that it will suffer irreparable harm unless the injunction is granted. "The requisite feared injury or harm must be irreparable – not merely serious or substantial, and 'it must be of a peculiar nature, so that compensation in money cannot atone for it.'" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). Under well settled Third Circuit precedent, if a copyright plaintiff establishes a prima facie case of infringement, that finding raises a rebuttable presumption of irreparable harm without a detailed showing of such harm. *Marco v. Accent Pub. Co.*, 969 F.2d 1547, 1553 (3d Cir. 1992); *Educational Testing Serv. v. Katzman*, 793 F.2d 533, 543-44

(3d Cir. 1986); *Apple Computer, Inc. v. Franklin Computer, Inc.*, 714 F.2d 1240, 1254 (3d Cir. 1983); *CMM Cable Rep., Inc. v. Keymarket Communications, Inc.*, 870 F. Supp. 631, 639 (M.D. Pa. 1994). In this case, York is entitled to the rebuttable presumption of irreparable harm because it has proved a prima facie case of copyright infringement. *Supra* at Part III.A.

  Maxwell, however, contends that York's delay in filing for a preliminary injunction overcomes the presumption. York knew of Maxwell's design by at least January of 2001 when its representatives saw an advertisement preview for the Maxwell collection featuring the elephant design at issue. York, however, did not contact Maxwell officials until four months later when it sent Maxwell President Richard Emmert a courtesy copy of the complaint in the instant matter. Furthermore, York did not file the instant motion for preliminary injunction until February 28, 2002 – over one year after York first learned of the Maxwell design and almost nine months after initiating litigation.

  A showing of unnecessary delay in filing for preliminary injunction can rebut the presumption of irreparable harm. *Sunquest Info. Sys., Inc. v. Park City Solution, Inc.*, 130 F. Supp.2d 680, 698 (W.D. Pa. 2000) (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979) ("Delay . . . undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.")). Maxwell relies on *New Dana Perfumes Corp. v. The Disney Store, Inc.*, 131 F. Supp.2d 616 (M.D. Pa. 2001) to support its assertion that York's delay of over a year between learning of the Maxwell design and the filing of the present motion militates against a finding of irreparable harm. In *Disney*, the plaintiff accused the Disney Store of violating its

trademark in both the name and character of Tinkerbell, from the Peter Pan story.[3] The instant matter, however, is readily distinguishable from that scenario. In that case, the court preliminarily noted the absurdity of the plaintiff's claim of irreparable harm given the fact the plaintiff knew of Disney's use of the Tinkerbell character since 1953, when Walt Disney Productions released the animated movie "Peter Pan." Additionally, the plaintiff's predecessor in interest had a longstanding commercial relationship with Disney concerning the use of the Tinkerbell character in Disney merchandise.

Obviously, there is no such longstanding uncontested use of the copyrighted material in the case at bar. Instead, Maxwell focuses solely upon the *Disney Store* decision's discussion of the plaintiff's delay in filing for injunctive relief:

> In this case, there is an unexplained delay of two months in presenting a cease and desist order, and another unexplained delay of five months in moving for injunctive relief. Under these circumstances, plaintiff's delay, alone, precludes a finding of irreparable harm, and therefore warrants denial of the preliminary injunction motion concerning The Disney Store Tinker Bell-related products.

*Id.* at 630.

In this case, York delayed, at a maximum, four months between first learning of the Maxwell design and the filing of the suit. Unlike the delay in *The Disney Store* case, York can explain its delay. As counsel for York points out in its briefing, York personnel and counsel conducted a thorough investigation of the market to determine whether their product was truly unique. (Pl. Reply Br. at 8.) During this period, York also filed the application for copyrights giving rise to this

---

[3] Sir James Matthew Barrie, Peter Pan; or the Boy who would not grow up (1928).

14

suit. Once it was satisfied that the results of its investigation definitively indicated that copying had occurred, York filed suit. Courts have upheld similar delays where plaintiffs conduct investigations to determine the scope and severity of an alleged intellectual property infraction. *See, e.g., Sunquest Info. Sys., Inc.*, 130 F. Supp. at 698; *see also Playboy Enters. v. Chuckleberry Publ'g*, 486 F. Supp. 414, 435 (S.D.N.Y. 1980) ("[P]arties should not be encouraged to sue before a practical need to do so has been clearly demonstrated.").

Maxwell also makes the captious claim that York's delay during the period beginning with the filing of the suit in May 2001 until filing the instant motion in February 2002 supports a finding of no irreparable harm. Yet, once again, it would be unfair to describe this delay as unexplained. As the record indicates, York filed the complaint in the instant action on May 7, 2001. Maxwell and York subsequently filed a joint motion on June 27, 2001 to extend the period for Maxwell to file an answer until July 23, 2001. (Doc. 4.) In the joint case management plan, both parties indicated that they would be amenable to using some sort of alterative dispute resolution method for settling the matter. (Doc. 9 at p.5.) By a letter dated November 27, 2001, York's counsel, Kendra McGuire, requested that the court appoint a mediator. (Doc. 18.) Additionally, Ms. McGuire indicated that she had spoken with Maxwell's counsel, Albert Robin, who agreed with her that the matter would not be ripe for mediation until January 2002. (*Id.*) On January 18, 2002, the mediator filed his report indicating that the parties were unable to resolve their differences. (Doc. 20.)

Given this record, it would ignore reality to conclude that York acted dilatorily in filing for injunctive relief. Moreover, Maxwell participated in each

delay in the progression of the litigation. For instance, Maxwell requested an extension of the period for filing an answer and its counsel also indicated that the matter would not be ripe for mediation until January 2002. Maxwell should not, under these circumstances, be allowed to raise delay as a ground for overcoming the presumption of irreparable harm. Obviously, the parties were engaged in ongoing settlement discussions which, unfortunately, turned out to be fruitless. Under these facts, the court cannot conclude that York unnecessarily delayed in filing for injunctive relief. *Accord Times Mirror Magazine v. Las Vegas Sports News*, 212 F.3d 157 (3d Cir. 2000) (holding that fifteen-month delay did not overcome presumption of irreparable harm where settlement negotiations caused the delay).

       Furthermore, the court finds that even if York was not entitled to a presumption of irreparable harm, it has convinced the court that it will suffer irreparable harm if the injunction does not issue. Testimony at the preliminary injunction hearing indicated that York is a leader in the field of wall covering design. It invests an unusually large portion of its capital in procuring and producing original design work. This effort has contributed to York's industry-setting reputation for original design work. Due to this significant investment, York must charge a higher price for its wall coverings and borders in order to make a profit. Maxwell does not incur such high expenses because it does not purchase archived collections and has a much smaller in-house design studio. Not surprisingly, it lacks the heralded reputation that York enjoys. By selling the allegedly copied design for a lower price, Maxwell, a direct competitor, is able to both steer York's customers towards its product and to weaken York's reputation for original design work. Injury to reputation is difficult, if not impossible, to redress in

16

monetary terms, and courts dealing with this issue have found that evidence of an injury to reputation can support a claim of irreparable harm. *See Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 195-96 (3d Cir. 1990) (holding that irreparable harm occurs when infringing trademark causes potential injury to reputation and goodwill of trademark holder); *Sunquest Info. Sys.*, 130 F. Supp.2d at 697 (holding that finding of likelihood of confusion between valid trademark and infringing trademark supports a finding of irreparable harm).

As the preceding discussion indicates, York is entitled to a presumption of irreparable harm because it has proved a prima facie case of copyright infringement. This presumption is not overcome by the fallacious accusation that York delayed in filing for injunctive relief. Furthermore, York has provided evidence that alone would entitle it to a finding that it will suffer irreparable harm if the injunction does not issue. Based on these findings, the court concludes that York has made the necessary showing of irreparable harm.

### C.     Harm to Defendant

In deciding whether injunctive relief is appropriate, the third prong of the analysis requires that the court determine whether the defendant will suffer irreparable harm should the injunction be issued. This factor is sometimes referred to as the balancing of the equities. "A basic purpose behind the balancing analysis is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the [owner of the intellectual property interest.]" *Opticians Ass'n*, 920 F.2d at 197.

In this case, Maxwell argues that granting the injunction is tantamount to enjoining the marketing of the remaining wall cover and border designs in its

Sesquicentennial Collection. According to Emmert, if Maxwell is forced to instruct its retailers to remove the allegedly infringing designs from the sample books, the retailers will simply discard the entire sample book. Given that the sample book contains some one-hundred plus wall covering and border designs, the result would be, according to Maxwell, financially catastrophic.

The court, however, disagrees with Maxwell's prediction. It is uncontested that wall paper retailers pay in excess of $60 a piece to purchase sample books from designers like York and Maxwell and that the books are an essential part of the retailers' marketing strategy. Yet, somehow Emmert takes this information and comes to the conclusion that the better wall paper retailers would rather discard a $60 investment than simply stamp certain designs "not available" or remove the infringing pages from the book. The absurdity of this argument is further highlighted by the fact that Maxwell has never had a sample removed from its sample book. Thus, Maxwell is unqualified to speak as to what its retailers normally do in this situation. The court will not base its balancing of the equities on Maxwell's highly speculative stance.

The court, though, is not deaf to Maxwell's concerns. The elephant design also appears on both the cover and binder for the Sesquicentennial Collection sample book. Although these aspects of Maxwell's sample book undoubtably lead to consumer confusion, York's copyrights extend only to the wall cover and border designs. Because York does not have a copyright as to the cover or spine of its sample book, its legal argument in favor of ordering Maxwell to alter the Sesquicentennial Collection's cover is tenuous at best. Unlike the removal of pages, requiring retailers to either remove or alter the cover of an entire sample book would

18

be an onerous task. The court is not so confident that, in this context, retailers would not simply throw the entire sample book in the garbage. If this were to occur, Maxwell would suffer irreparable harm as the marketing of its entire Sesquicentennial Collection would be halted.

Balancing the equities, the court finds that requiring Maxwell to stop selling and marketing the infringing wall coverings and border designs will not result in irreparable harm to Maxwell. However, requiring Maxwell to alter or remove the cover and/or spine of the Sesquicentennial Collection's sample book may result in irreparable harm to Maxwell.

### D. The Public Interest

Finally, the court must consider the public interest. " '[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work.' " *Apple Computer, Inc.*, 714 F.2d at 1255 (quoting *Klitzner Indus., Inc. v. H.K. James & Co.*, 535 F. Supp. 1249, 1259-60 (E.D. Pa. 1982)). The Copyright Act itself authorizes the issuance of injunctions when necessary to prevent the infringement of a copyright. 17 U.S.C. § 502(a). Because the court finds that there is a substantial likelihood that Maxwell infringed York's copyright, it appears that the public interest counsels in favoring of issuing an injunction to prevent this injury from continuing.

**IV.     Conclusion**

The court finds that there is a substantial likelihood that York will succeed on its claim that Maxwell has infringed York's copyrights in certain wall covering and border designs. Maxwell has failed to overcome the presumption that York is irreparably harmed by Maxwell's infringement. Both the balance of the equities and the public interest counsel in favor of granting an injunction preventing Maxwell from selling or marketing the wall covering and border designs at issue in this case. However, the court will not go so far as to order that Maxwell replace or alter the cover and/or spine of its Sesquicentennial Collection sample book. An appropriate order will issue.

*/s/ Sylvia H. Rambo*
SYLVIA H. RAMBO
United States District Judge

Dated: June 10th, 2002.