UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| YORK WALLCOVERINGS, INC. | : | |
| Plaintiff | : | No.: 1:CV:01-0793 |
| | : | |
| vs. | : | |
| | : | |
| S.A. MAXWELL COMPANY, INC. AND | : | (The Hon. Sylvia H. Rambo) |
| JAIMA BROWN | : | |
| Defendants | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION PURSUANT TO F.R.C.P. 62(c)
TO STAY PRELIMINARY INJUNCTION
<u>ORDER PENDING APPEAL</u>**

Plaintiff, York Wallcoverings, Inc. (hereinafter "York"), submits this brief in opposition to Defendants' Motion Pursuant to F.R.Civ. P. §62(c) to Stay Preliminary Injunction Order Pending Appeal.

FACTS

On June 10, 2002, the Court entered an order granting York's motion for a preliminary injunction. The Court also issued a very detailed Memorandum Opinion (hereinafter "Memorandum") on the same date. Thereafter, by an order dated June 18, 2002, the Court directed York to post a bond in the amount of $50,000. York is in the process of finalizing the purchase of the bond. The bond will be in place by the end of the week.

On or about June 12, 2002, Defendants filed their motion to stay and amend the Court's Order of June 10, 2002. They filed a brief in support thereof on or about the same date.

York opposes the request to stay, and the request to amend, the Court's Order of June 10, 2002.

## ARGUMENT

I. The Order granting the preliminary injunction should not be stayed.

The trial court has complete discretion to decide whether a stay should be entered, pending an appeal of the entry of a preliminary injunction. <u>Larami v. Lanard Toys, Inc.</u>, 1992 WL 20320 (E.D. Pa.). The party requesting the stay has the burden of proving the following: (1) that it is likely to succeed on the merits of the appeal; (2) that it would suffer irreparable injury unless a stay is granted; (3) that the stay would do no harm to the other party; and (4) that the public interest favors the grant of the stay. <u>Howes v. Medical Components, Inc.</u>, 741 F. Supp. 528 (1990); <u>Sentry Insurance v. Pearl</u>, 662 F. Supp. 1171 (1987). One court has commented that "[t]hese are the very same factors the court discussed in arriving at the decision to grant the preliminary injunction." <u>Larami</u>, supra. at 1. When the 4 elements that comprise Defendants' burden on the granting of a stay are evaluated, it becomes clear that a stay is not proper in this instance.

1. Likelihood of Success on the Merits

Defendants raise two issues when addressing the likelihood of their success on appeal. First, Defendants argue that the Court's Order of June 10, 2002 failed to require the posting of a bond in violation of F.R. Civ. P. 65. This objection is rendered moot by the Court's Order of June 18, 2002 and the posting of the bond by York. With the posting of the bond, Defendants

are protected from harm in the unlikely event the Order granting the injunction is overturned on appeal.

Next, Defendants argue that the Court's findings regarding irreparable harm constitute reversible error. When making this argument, Defendants appear to focus almost exclusively on the Court's finding that York was entitled to the presumption of irreparable harm, thus ignoring the Court's finding that irreparable harm was, indeed, proven. Simply put, Defendants fail to acknowledge that the Court's findings regarding irreparable harm were twofold. First the Court, after a detailed analysis, found that York was entitled to a presumption of irreparable harm "because it proved a prima facie case of copyright infringement." See, Memorandum, p. 17. Thereafter, the Court found that even if York was not entitled to the presumption, it had proven irreparable harm. See, Memorandum, id.

Defendants complain that the Court failed to address three of the cases they cited. Clearly, the Court can choose to rely on certain cases cited by either party and is under no mandate to discuss each and every case raised in a brief by a litigant. Nevertheless, a quick review of each of the three cases establishes that they are readily distinguishable from the case sub judice. At the outset, it should be noted that two of the cases involve an alleged trademark infringement.[1]

---

[1] This distinction is of varying concern to Defendants. On pages 4 and 5 of their brief, Defendants urge the Court to consider rulings in trademark infringement cases. Yet, later on page 5 of their brief, Defendants argue that the Court's reliance on Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C., 212 F. 3d 157 (3d Cir. 2000), is misplaced because, inter alia., the case involves "claims of trademark infringement and dilution, not copyright." See page 5 of Defendants' Brief.

1087736_1

3

The first case referenced by Defendants is <u>Country Floors, Inc. v. Gepner</u>, 1989 WL 70719 (E.D. Pa.), a trademark infringement case involving a flooring tile importer. In <u>Country Floors</u>, the plaintiff delayed six years before seeking relief from defendants' alleged trademark infringements. The court in <u>Country Floors</u> did not do a detailed analysis of irreparable harm, presumably due to the lengthy lapse in time. Clearly, a six year period is patently unreasonable and would defeat an assertion of irreparable harm. By contrast, York did not wait for a similarly long period of time and could readily explain the reasonableness of the timetable it followed to bring the injunction petition.

<u>American Int'l. Group v. American Int'l. Airways, Inc.</u>, 726 F. Supp. 1470 (E.D. Pa. 1989), a trademark infringement case, is also clearly distinguishable from the one at bar. In <u>American Int'l. Group</u>, the court's ruling focused on the fact that the plaintiff failed to make a preliminary showing of infringement. Therefore, the court found that plaintiff was not entitled to the presumption of irreparable harm. Plaintiff was, thereafter, unable to prove irreparable harm, having operated for three years without any demonstrable harm. Plaintiff's trademark claim was further compromised by the proliferation of the use of the name "American International", thereby preventing plaintiff from meeting its burden of proving irreparable harm. The case sub judice is entirely distinguishable from the holding in <u>American Int'l Group</u>. York was able to make its preliminary showing of irreparable harm. York did not delay for a three year period. Finally, York provided direct, uncontested testimony regarding the exclusivity of its designs. This evidence was not rebutted by Defendants.

The court's opinion in <u>Richard Feiner and Company, Inc. v. Turner Entertainment Co.</u>, 98 F. 3d 33 (2d Cir. 1996), if instructive in this case, is instructive for the proposition that, if

1087736_1

4

there is "delay," the analysis then turns to the explanation for and reasonableness of the "delay." The Court sub judice undertook a detailed analysis of the timeline involved in this case and found it to be reasonable. Feiner is distinguishable on this factor alone.

Next, Defendants cite to another trademark case, New Dana Perfumes Corp. v. Disney Store, Inc., 131 F. Supp. 2d 616 (M.D. Pa 2001), for the proposition that an "unexplained delay of two months in presenting a cease and desist letter and another five months in moving for injunctive relief precluded a finding of irreparable harm...." See, Defendants' Brief, page 5. Defendants' assertion is based on a limited and selective reading of the court's ruling in New Dana. A careful reading of the court's holding in New Dana establishes that the delay was, in fact, one of several years, not months. In its opinion, the New Dana court clearly noted that the plaintiff first objected to the defendant's use of its mark in 1992 and ultimately brought its injunction motion approximately eight years later. New Dana, 131 F. Supp. 2d at 624-625. The court further referenced interaction and discussions between plaintiff and defendant in 1994, 1998 and 1999 regarding infringement of the Tinkerbell trademark. York submits that the timetable of each case has to be reviewed in its entirety and that when the timetable sub judice is evaluated, it is, as the Court found, reasonable and not dilatory.

Finally, as stated earlier, Defendants argue that the Court's reliance on Times Mirror, supra., is misplaced, inter alia., because it is a trademark case. Yet, Defendants repeatedly and primarily cite to trademark cases in their pre-hearing and post-hearing submissions to this Court. Nevertheless, the Court's cite to Times Mirror, supra., is entirely appropriate. Like the Plaintiff in Times Mirror, York forbore on seeking injunctive relief pending mediation, a process to which both parties agreed at the outset of the litigation. In both instances, courts found that each

1087736_1

5

plaintiff was entitled to the presumption of irreparable harm. Even more compelling in the case at bar is the fact that the Court did not rest on this presumption alone. The Court has also held that York has proven irreparable harm. See, Memorandum, P. 16. Simply put, Defendants are unlikely to succeed on their appeal.

2.  Irreparable Harm

Defendants' arguments with respect to the bond are now moot. Defendants also argue that they will lose all future sales of the patterns at issue. This is a curious argument as Defendants have been defending the damages portion of this action by professing how few sales of the infringing patterns it has truly made. See, Report of Frank A. Bernatowicz, Exhibit F.[2] Defendants' damages expert has opined that Defendants have yet to see any profit on the infringing patterns and are sustaining a loss on the *Sesquicentennial* sample book. See, Report of Frank A. Bernatowicz, pages 9 and 10.

Simply put, Defendants did not present credible evidence of its own potential harm at the hearing on the preliminary injunction. The only testimony offered in this regard was that of Maxwell's President, Mr. Emmert. His testimony was based almost wholly on supposition. As the Court pointed out in its Memorandum, "...Maxwell has never had a sample removed from its sample book. Thus, Maxwell is unqualified to speak as to what its retailers normally would do in this situation." See, Memorandum, page 18. Finally, although Defendants have not proven harm, if they are harmed, such harm can be compensated by the posting of a bond.

---

[2] Defendants have designated their expert report as confidential and accordingly it will be provided to the Court under separate cover.

1087736_1

6

3.     Plaintiff's Harm

In this regard, Defendants continue to reiterate their position on the timing of York's injunction petition. The Court evaluated this factor in great detail in its Memorandum opinion. This issue has been addressed at length above. The Court's determination of York's harm in this instance is the same as its determination of harm for purposes of entering the injunction order. York, as the copyright owner, is being harmed by Defendants' infringing products. The Court's decision should not be disturbed.

4.     The Public Interest

Defendants argue, without citation to any case, that the public interest will not be "disserved" if the Court stays the injunction order. This, however, is not the standard by which the request for stay should be judged. See generally, Howes, supra. and Sentry Insurance, supra. Defendants fail to address the strong public interest in upholding copyright protections. See, Apple Computer v. Franklin Computer, 714 F.2d 1240, 1255 (3d Cir. 1983), cert. denied, 464 U.S. 1033 (1984); Dam Things from Denmark v. Russ Berrie & Co., Inc., 173 F. Supp. 2d 277, 291 (D.N.J. 2001). Defendants offer no evidence of a public interest favoring the grant of a stay.

II.    The Preliminary Injunction Order should not be modified.

Defendants make the statement, unsupported by any evidence, that they cannot control retailers and do not directly deal with retailers. This assertion contradicts information obtained through discovery taken in this matter. In fact, sworn testimony shows that Defendant Maxwell

1087736_1

7

sells directly to some retailers and that Ms. Brown has a great deal of interaction with retailers. The testimony of Starr Paz, Vice President of Operations for Maxwell, testified that Maxwell sells directly to two to three retail stores. See, Deposition testimony of Starr Paz, page 23, lines 13 to 18, attached hereto as Exhibit "A". Additionally Ms. Paz testified that Ms. Brown visits with retailers "a dozen or more times a year." See, Deposition testimony of Starr Paz, page 34, line 23 to page 35, line 20, attached hereto as Exhibit "B." Defendants by their own admission have dealings with retailers.

Regardless of Defendants' interaction with retailers, it is disingenuous to argue that Defendants have no control over their product once it leaves the mill. Defendants supply distributors who supply retailers. Defendants know who their distributors and retailers are. Defendants feed their distributors with product and distributors then distribute it to their retailer based on orders. Defendants have disclosed their list of distributors in the discovery process. Directives that the infringing product is no longer available can be sent through the same distribution lines. Moreover, the Court gave Defendants an alternative means to halt the sale of the infringing product.

As an alternative, York would be willing to undertake, at Defendants' expense, the notification of Defendants' distributors and retailers regarding the unavailability of the infringing products. York submits that it will not find the same impediments as Defendants profess in their Brief. According to the testimony of Arch LeRue Brown given at the injunction hearing, York has had experience, although limited, of pulling its product from the market place.

If the Court's Order of June 10, 2002 should be amended in any fashion, it would be to spell out, in exact terms, that distributors are not to sell or ship any existing inventory of the

1087736_1

8

infringing product currently in their possession. York believes that this directive is clearly part of the Court's June 10, 2002 Order, but is concerned about Defendants' individual interpretation of the Order, particularly given assertions made regarding their request for modification of the Court's Order of June 10, 2002.

## CONCLUSION

Based on the authority and argument contained herein, York asks the Court to deny Defendants' request to stay and to amend the Court's Order of June 10, 2002.

BARLEY, SNYDER, SENFT & COHEN, LLC

Date: 6/24/02

BY: _____
Kendra D. McGuire, Esquire
Attorneys for Plaintiff
York Wallcoverings, Inc.

126 East King Street
Lancaster, PA 17602
(717) 299-5201
Court I.D. No. 50919

1087736_1

9

1   MR. ROBIN: They're included in our sales
2   figures. You reminded me to exclude them. Thank
3   you. I would never have thought of that.
4   MS. McGUIRE: So happy to help you out.
5   MR. ROBIN: I know, you're trying to help.
6   MS. McGUIRE: I take it, Mr. Robin, if you're
7   taking the position that any of those sales should
8   be excluded, you will give me the number of those
9   sales?
10  MR. ROBIN: Yes. They're small. I haven't
11  bothered to take them out.
12  MS. McGUIRE: Okay.
13  Q    Does Maxwell distribute or -- well, distribute
14  directly to any retailers or have any of its own retail
15  outlets?
16  A    We have no retail outlets. We do, I don't think
17  it's called distribute, it's just we do sell direct to
18  two or three retail stores.
19  Q    And what are the names of those retail stores?
20  MR. ROBIN: I'm going to object. It seemed to me
21  that we have not considered the names of accounts to
22  be pertinent to this litigation. I mean I'm happy
23  to take the issue up with you, and on a mutual basis
24  we can discuss who each other's customers were. I

CONFIDENTIAL

34

B

```
 1   competitor suggesting that there was a copyright
 2   infringement?
 3       A   No.
 4       Q   Has Maxwell ever sued over a copyright
 5   infringement?
 6       A   Not to my knowledge.
 7       Q   Are there any plans for carrying the elephant
 8   design over into another collection at Maxwell?
 9       A   Not at this time.
10       Q   Is there an industry norm with respect to
11   expectations on how sales of the book will progress?  In
12   other words, do you expect to capture X number of sales
13   in the first three months of a book?
14       A   I'm sure there is an industry norm.  I'm not
15   really sure what the formula is.
16       Q   During your tenure at Maxwell, has Maxwell ever,
17   for any reason, had to remove product from the market,
18   recall it from distributors or retailers?
19       A   No, never.
20       Q   There's never any quality-type control issue or
21   defect in manufacturing which caused product to be --
22       A   Not where we'd have to recall an entire run, no.
23       Q   Do you know if Ms. Brown ever frequents retail
24   outlets in her capacity as a Maxwell employee?
```

CONFIDENTIAL

35

1    A    She does.

2    Q    And how often in the course of a year does she go
3 to retail outlets?

4    A    I don't know.

5    Q    Was it once a month or twice a year, are you able
6 to estimate for me?

7    A    I would say maybe a dozen, a dozen times or more
8 a year.

9    Q    And to the best of your understanding, why does
10 she go to retail outlets?

11   A    She normally goes to show a new line.

12   Q    And what does she do to show a new line?

13   A    She takes the designs, normally they have been
14 colored, and she just kind of displays them.  And I doubt
15 that they've got the wall space, but I don't know how
16 they go through it.  But she shows them designs and
17 colors and then just wants some feedback on it.

18   Q    Does she do this before a collection is
19 published?

20   A    Yes.

21        MS. McGUIRE:  Off the record.

22        (Discussion off the record.)

23 BY MS. McGUIRE:

24   Q    Ms. Brown testified in the course of her

KRUSE & ASSOCIATES, LTD.
(312) 345-1500

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Brief in Opposition to Defendants' Motion Pursuant to F.R.Civ.P. 62(c) to Stay Preliminary Injunction Order pending Appeal has been served this ____24th____ day of June, 2002, by first-class mail, postage pre-paid, upon:

        Albert Robin, Esquire
        Robin, Blecker & Daley
        330 Madison Avenue
        2nd Floor
        New York, NY  10017

        BARLEY, SNYDER, SENFT & COHEN, LLC

        By: _____
            Kendra D. McGuire, Esquire
            Attorneys for Plaintiff
            York Wallcoverings, Inc.

        126 East King Street
        Lancaster, PA  17602-2893
        Court I.D. No. 50919

1087736_1