ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| YORK WALLCOVERINGS, INC. | : | |
| Plaintiff | : | No.: 1:CV:01-0793 |
| | : | |
| vs. | : | |
| | : | |
| S.A. MAXWELL COMPANY, INC. | : | (The Hon. Sylvia H. Rambo) |
| AND JAIMA BROWN | : | |
| Defendants | : | |

FILED
HARRISBURG,
AUG 0 9 2002
MARY E. D'ANDREA
Per _____ Deputy Cl

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO PRECLUDE
EVIDENCE OF INDEPENDENT CREATION**

I. **BACKGROUND**

Throughout their filings with this Court and at the hearing on Plaintiff's motion for a preliminary injunction, Defendants have maintained that Maxwell's elephant design was the product of independent creation, not copying. It is anticipated that Defendants will attempt to rely on this defense again at the trial of this matter. However, the evidence of record and developed during discovery in this case and that presented at the preliminary injunction hearing conclusively establishes that the two designs in this case are so "strikingly similar" that Maxwell's elephant design cannot have been the product of independent creation. Indeed, this Court has already ruled that Defendants' evidence was insufficient to

SC/1099012.1

1

prove independent creation. Since the time of the hearing, Defendants have come forward with no additional evidence in support of this defense and thus, are still unable to establish that Maxwell's design was independently created. Accordingly, Plaintiff York Wallcoverings, Inc. has filed a Motion in Limine seeking to preclude Defendants from introducing evidence to support or arguing at trial, the defense of independent creation. This Brief is in support of York's Motion.

## II. ISSUES PRESENTED

### A. WHETHER DEFENDANTS SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE OR ARGUING AT TRIAL THAT MAXWELL'S ELEPHANT DESIGN WAS THE PRODUCT OF INDEPENDENT CREATION WHERE THE TWO DESIGNS ARE "STRIKINGLY SIMILAR" AND THIS COURT HAS ALREADY DETERMINED THAT DEFENDANTS' EVIDENCE WAS INSUFFICIENT TO ESTABLISH INDEPENDENT CREATION?

Answered in the AFFIRMATIVE by Plaintiff York Wallcoverings, Inc.

## III. ARGUMENT

### A. DEFENDANTS SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE OR ARGUING AT TRIAL THAT MAXWELL'S ELEPHANT DESIGN WAS THE PRODUCT OF INDEPENDENT CREATION WHERE THE TWO DESIGNS ARE "STRIKINGLY SIMILAR" AND THIS COURT HAS ALREADY DETERMINED THAT DEFENDANTS' EVIDENCE WAS INSUFFICIENT TO ESTABLISH INDEPENDENT CREATION.

order to support a finding of independent creation. <u>Universal Athletic Sales Co. v. Salkeld</u>, 511 F.2d 914, 918 (3d Cir. 1975).

The similarities found between the York elephant wallcovering and the infringing Maxwell elephant design are, at the very least, strikingly similar. Common elements include the subject matter of the wallpaper and border, the use of elephants and leaves, the placement of elements, the dress of the elephants, color, the texture of the paper as well as the scale and use of lattice or scroll work in the design. After considering the two designs at the preliminary injunction hearing, this Court in its Opinion noted:

> Upon a cursory visual examination, it appears that the two designs have much in common. They both feature repeating patterns of walking Indian elephants dressed in ornamental attire. Additionally, both contain latticed backgrounds. In both designs, the elephant illustrations are separated by illustrations of vegetation, albeit the York design features leafy foliage and the Maxwell design employs palm trees and leaf scrolls. All elephants in the [final] Maxwell design have their trunks raised, while only half of the elephants in the York design have their trunks raised. However, **these differences are minimal in the face of the overwhelming similarities and general aesthetic feel of the two designs.**

<u>See</u> Opinion and Order dated June 10, 2002 pp. 10 (emphasis added).

No ordinary observer, seeing the two products together, could fail to see the striking similarity of the two elephant wallpaper designs. Even in a side-by-

side comparison, it is difficult to differentiate between the two works. Indeed, as demonstrated at the injunction hearing, when the York border and the infringing Maxwell border are interchanged and placed on the competitor's sidewall, it is nearly impossible to tell that the border and wallpaper are from two different collections and, in fact, two different companies altogether.

At the injunction hearing, Defendants attempted to convince this Court that the Maxwell design was independently created. In support of this argument, Maxwell presented evidence that the York design was only one sample in an extensive design brief provided to William Carroll. The Court found this fact unpersuasive given all of the other facts weighing in favor of a finding of copying. See Opinion pp. 11. Defendants also attempted to highlight various differences between the York design and their own as support for their independent creation defense. The Court rejected this argument as well, finding that the differences in the Maxwell design were minor and were "insufficiently creative" to establish independent creation. Id. at pp. 11-12. Since the time of the hearing, Defendants have not disclosed any additional facts in support of their independent creation defense. Discovery is now closed. Therefore, at this stage,

Defendants' evidence is still insufficient to establish that the Maxwell design was independently created.

In deciding whether a design is the product of copying or independent creation, the defendant's **access to and knowledge of the plaintiff's work are compelling indicia of plagiarism**. Rexnord, Inc. v. Modern Handling Systems, Inc., 379 F. Supp. 1190, 1194 (D. Del. 1974) (emphasis added). In this case, Defendants admittedly had access to and knowledge of York's elephant wallcovering when Maxwell's elephant wallpaper was being designed. Indeed, Jaima Brown has admitted to providing a piece of York's elephant sidewall wallcovering to William Carroll and directing his attention to specific aspects of the York design. See, deposition testimony of Jaima Brown, pp. 67-69 and 85-86, attached hereto as Exhibit A. She has also admitted to being the individual who developed the colorways for the Maxwell wallpaper. See, deposition testimony of Jaima Brown, p. 12, attached hereto as Exhibit B. Mr. Carroll admits to having received and viewed the piece of York's elephant sidewall prior to beginning the process of drawing his version of the design. See, deposition testimony of William Carroll, p. 16, attached hereto as Exhibit C. As both individuals involved in the design process admit to seeing and possessing York's

elephant sidewall design prior to commencing their design, it begs the question of "independent" creation. How can an infringing design be "independently created" when the competitor's original design is in the possession of the infringers? Both Mr. Carroll and Defendant Brown saw and possessed the design and the design played a role in their creative process.

The overwhelming similarities between the two designs preclude the possibility that Defendants were able to compose the accused work as a matter of independent creation. When coupled with Defendants' admitted access to and knowledge of York's design and the fact that Maxwell, like York, chose to display the elephant design on the cover of its wallpaper sample book, the possibility that the Maxwell design resulted from mere coincidence or independent creation is simply not credible. Such a possibility is not supported by the facts in this case. Since the facts of record establish "striking similarity" between the York and Maxwell designs sufficient to preclude the possibility of independent creation, Defendants should be precluded from introducing evidence or arguing to the jury at trial that the Maxwell elephant design was independently created.

## IV. CONCLUSION

In the instant case, the similarities between the two designs are so overwhelming that no reasonable finder of fact could fail to conclude that Maxwell's elephant design was, in fact, copied from York. Based on the above cited authorities and reasoning, Plaintiff York Wallcoverings, Inc. respectfully requests that this Honorable Court grant York's Motion in Limine and preclude Defendants from introducing evidence, presenting testimony or arguing at trial that Maxwell's elephant wallpaper and border were the product of independent creation.

BARLEY, SNYDER, SENFT & COHEN, LLC

Date: 8/9/02

By: _____
Kendra D. McGuire, Esquire
Stephanie Carfley, Esquire
Attorneys for Plaintiff
York Wallcoverings, Inc.

126 East King Street
Lancaster, PA 17602
(717) 299-5201
Court I.D. No. 50919
Court I.D. No. 79136

SC/1099012.1

8

1  Q    Are you referencing all the elephants that
2  you provided to him in your -- in your reference --
3  A    Reference pile.
4  Q    -- pile?
5  A    Yes.
6  Q    The next bullet point in your design brief,
7  "Make textural similar to elephant samples." To what
8  are you referring?
9  A    Well, I'm referring to this because this is
10 textural fabric and to this texture here.
11       MS. McGUIRE:  So the witness is referring
12 to Brown 5, and we've not marked that other -- a
13 poor color copy, but I think it's a color copy,
14 nevertheless.
15       THE WITNESS:  It's the same design. It's
16 the texture I was talking about.
17       MS. McGUIRE:  For purposes of the record,
18 we'll mark this, but I'll ask you to hold onto
19 that.
20       MR. ROBIN:  Okay, fine. I have no problem
21 with that.
22            (Brown Deposition Exhibit No. 10
23            marked for identification.)
24       MS. McGUIRE:  For purposes to preserve it,

KRUSE & ASSOCIATES, LTD.
(312) 345-1500

```
 1         why don't we mark the original as Brown 11.
 2              MR. ROBIN:  So 10 is the copy and 11 is the
 3         original.
 4                   (Brown Deposition Exhibit No. 11
 5                   marked for identification.)
 6    BY MS. McGUIRE:
 7         Q    All right.  So that I understand it, the
 8    "Make textural similar to elephant samples," refers
 9    to Brown 11 and Brown 5?
10         A    Uh-huh.
11         Q    Is that correct?
12         A    Yes, these are the samples.
13         Q    That you're referencing in your design
14    brief?
15         A    Yes.
16         Q    The next bullet point, "This design to
17    coordinate but not to be exact design as fabric."
18    Again, what fabric are you referring to?
19         A    Well, that would be these fabrics but
20    mostly fabric as well.
21              MR. ROBIN:  Brown 5.
22    BY MS. McGUIRE:
23         Q    Mostly Brown 5 but also referring to
24    Brown 8?
```

1     A    Yes.

2     Q    Next sentence, "Want it more like a
3  textural paper like the elephant sample." And what
4  are you referring to?

5     A    That would be referring to this texture
6  here.

7         MR. ROBIN: Brown 11.
8  BY MS. McGUIRE:

9     Q    And that's Brown 11. "Have some of the
10 beige from the choke come through into the motifs."
11 What are you referring to?

12    A    So when he paints it, I don't want it flat.
13 I wanted more of a textural -- I wanted the linen
14 texture to come through.

15    Q    Now, referring you back to Brown 11 and a
16 copy which is Brown 10, where did you obtain what's
17 been marked as Brown 11?

18    A    I don't recall where I got this.

19    Q    Would you agree with me that it's a piece
20 of wallpaper?

21    A    Yes.

22    Q    All right. How would you typically obtain
23 a piece of wallpaper that was not manufactured by the
24 company for whom you worked? What are the ways in

1   A   Oh, I probably looked at it once.  That's
2  correct.
3   Q   The exhibit that's been marked Brown 11,
4  did you know that this was a York wallcovering at the
5  time you gave this sample to Bill Carroll?
6   A   Yes.
7   Q   How did you know this was a York
8  wallcovering when you gave it to Mr. Carroll?
9   A   Because I've seen it before in that book.
10   Q   Prior to providing the design brief to
11  Mr. Carroll in April of 2000, did you read anything
12  in the trade literature regarding York's Passport
13  collection?
14   A   No.
15   Q   What's been marked as Brown Exhibit 11, is
16  this a smaller portion of a larger sample you had in
17  your possession at one time?
18   A   No.  I think that is the piece I have.
19   Q   Have you ever purchased a roll of York
20  wallcovering?
21   A   Never.
22   Q   Brown 11 has staple holes in it.  Do you
23  know what it was stapled to?
24   A   Probably to all these references.

1   Q   It's your practice to staple references
2   together?
3   A   Yes.
4   Q   Why did you include Brown Exhibit 11 in
5   with the reference materials that you gave to
6   Mr. Carroll?
7   A   Because I liked this textural effect. I
8   thought it showed texture.
9   Q   Do you recall asking Mr. Carroll at some
10  point during the design process to put more gold into
11  the design?
12  A   No, I don't recall that.
13  Q   Do you recall discussing with Mr. Carroll
14  the position of the elephant's trunk?
15  A   Yes.
16  Q   All right. What do you recall about those
17  discussions?
18  A   That trunks should be up. It's unlucky.
19  Q   I believe in Mr. Carroll's final design to
20  you, he -- we have at least one elephant depicted
21  with the trunk down?
22  A   Correct. Well, I had the engraver change
23  it because it's unlucky.
24      **MR. ROBIN:** Answer the question she asked

```
 1  employee designers or independently contracted
 2  designers?
 3       A    Yes.  Most of them were all freelancers
 4  then because I didn't have anyone working in the
 5  studio then, so they're mostly outside people.
 6       Q    And then you talked about coloring --
 7       A    Yes.
 8       Q    -- the collection?
 9       A    Right.  I color the collection.
10       Q    Would you explain to me what you mean by
11  coloring the collection?
12       A    I would research the color in the market.
13  I would get like -- you know, I have, like, towels
14  and sheets and things from Home Furnishings that I
15  usually color my line to.  I'm an expert in color.
16       Q    When you say you're an expert in color,
17  what do you believe your credentials are to make you
18  an expert in color?
19       A    Well, I have probably my track record in
20  design, and also I just have a good -- I have an
21  excellent eye for color for the balance.  It's very
22  technical actually because not everybody sees color
23  like maybe I would see color when it comes to
24  fine-tuning color.
```

1  you references?

2     A.     Yes.

3     Q.     Did she send you a piece of wallpaper with
4  the references?

5     A.     Yes.

6     Q.     Did you know where that piece of wallpaper
7  came from?

8     A.     No. I knew it was York. I don't remember
9  whether she told me it was a York or whether I knew it was
10 a York. I don't know.

11     Q.     Okay. But before you started designing you
12 knew that you had a piece of York wallpaper contained
13 within the reference materials that Ms. Brown sent you?

14     A.     Yes.

15     Q.     How large a piece of wallpaper was the York
16 wallpaper included in the reference materials?

17     A.     I would guess it was a repeat. If I get
18 wallpaper from anybody I would get a repeat. But again,
19 without sounding stupid, I can't remember.

20     Q.     When you say you would get a repeat, can you
21 be more specific and describe that for me?

22     A.     Twenty and a half deep by the width of the
23 wallpaper.

24     Q.     Why, and Ms. Brown would send you a full

Keenan Reporting Service
(717) 665-4060